**Gary REEVES, Plaintiff–Appellee,**

v.

**Jim McCONN, in his official capacity as Mayor of the City of Houston, Defendant–Appellant.**

No. 78–3570.

United States Court of Appeals, Fifth Circuit.

Nov. 24, 1980.

---

John G. Lione, Jr., Charles M. Williams, Robert J. Collins, Asst. City Attys., Houston, Tex., for defendant–appellant.

Henry A. Popkin, Matthew Horowitz, Houston, Tex., for plaintiff–appellee.

Before RUBIN, HENDERSON and REAVLEY, Circuit Judges.

REAVLEY, Circuit Judge:

The plaintiff below, Gary Reeves, seeks to disseminate certain political and educational views among the people of Houston, Texas, through the use of sound amplification equipment. Houston regulates such activity in section 29–6(a) and (b) of the city's Code of Ordinances, which requires in subsection (a) that one obtain a permit and in subsection (b) that one comply with specific restrictions on the use of sound amplification equipment outside of buildings or residential property.[1] Reeves filed this action challenging the restrictions contained in subsection (b) on the grounds that they are an unconstitutional infringement of

1. As originally enacted by the Houston City Council in early 1976, section 29–6 read as follows:

(a) No person shall use, or cause to be used any sound amplifying equipment outside of buildings or other enclosed structure within the city without first obtaining a permit to do so except on residential property. Such permit:

(1) May be obtained by making application to the tax assessor and collector.

(2) Requires payment of a five dollar ($5.00) fee.

(3) Will be valid for a one–week period and may be renewed without charge for an additional one–week period any time during the succeeding ninety (90) days.

(b) The use of sound amplification equipment outside of buildings, or other enclosed structures within the city, except on residential property, is subject to the following regulations:

(1) The operation of sound amplifying equipment is prohibited Monday through Saturday within the downtown business district. A permit must be obtained for the operation of such equipment in these areas on Sundays. Any such Sunday permit shall state the business district to which same applies and shall be valid for only one day. Each separate Sunday must have a separate permit. Provided, however, that the provisions of this section shall not apply to parade permits which have been obtained from city council.

(2) The operation of sound amplifying equipment is prohibited between the hours of 7:00 p. m. and 10:00 a. m. daily, and further prohibited on Sunday between 10:00 a. m. and 1:00 p. m.

(3) The sounds amplified shall not be obscene or slanderous.

(4) The sound amplifying equipment on a sound truck shall not be operated unless the truck is moving at a speed of at least ten (10) miles per hour, except when the sound truck is stopped or impeded by traffic. When the sound truck is stopped by traffic, the sound amplifying equipment shall not be operated for longer than one minute at each such stop.

(5) The operation of sound amplifying equipment is prohibited within one hundred (100) yards of any hospital, school, Church or courthouse.

(6) The volume of sound amplified shall be controlled so that it is not unreasonably loud, raucous, jarring, disturbing or a nuisance to persons within the area of audibility.

(7) No sound amplifying equipment shall be operated with an excess of twenty (20) watts of power in the last stage of amplification.

On May 16, 1978, the City Council amended and re–enacted section 29–6. The only significant amendment, however, was the following addition to subparagraph 5:

(5) The operation of sound amplifying equipment is prohibited . . . within fifty (50) yards of any public or private residential structure. For the purposes of this ordinance, 'public or private residential structure' shall mean any structure wherein a person or persons reside, either temporarily or permanently, including but not limited to single family and multi–family residences, apartments, duplexes, condominiums, motels, hotels, boarding houses, and rooming houses.

free speech protected by the First Amendment. The U.S. District Court for the Southern District of Texas found the restrictions to be unconstitutional because of overbreadth and vagueness and enjoined the city from enforcing them. The City of Houston appealed. We affirm in part and reverse in part.

## I. The Standing Issue

■ The City of Houston first attacks the jurisdiction of the district court on the grounds that no "case or controversy" under Article III exists because subsection (b) has never been enforced against Reeves or anyone else. In the first place, the record indicates otherwise. On June 1, 1978, the office of the city tax assessor and collector denied Reeves a permit to operate a sound truck in the downtown district during the week of June 1–7, and the only authority for that refusal was subsection (b). In the second place, the Supreme Court has often rejected the rule of standing that would require a plaintiff to submit to arrest or point to the arrest of another before he may challenge the subject ordinance in federal court. *See, e. g., Babbit v. United Farm Workers*, 442 U.S. 289, 297–299, 99 S.Ct. 2301, 2308–09, 60 L.Ed.2d 895 (1979); *Doe v.*

*Bolton*, 410 U.S. 179, 188, 93 S.Ct. 739, 745, 35 L.Ed.2d 201 (1973). When the challenged statute has not yet been enforced by the state, the proper question is whether the plaintiff faces a "realistic danger of sustaining a direct injury as a result of the statute's operation and enforcement." The injury must not be hypothetical, abstract, or speculative. *Babbit*, 99 S.Ct. at 2308–09.

The record below contains abundant evidence that Reeves' fear of prosecution or direct injury is not in the least hypothetical. He engaged in conduct prohibited by subsection (b) both before and after the district court enjoined the enforcement of the ordinance. At trial Reeves alleged a desire to use sound equipment in ways that would violate each of the provisions of subsection (b).[2] Conversely, the city gave strong indications that subsection (b) is "not moribund," *Doe v. Bolton*, 410 U.S. at 188–89, 93 S.Ct. at 745–46, when it re–enacted and strengthened that subsection and actually enforced subsection (a) against Reeves, both shortly before this suit was filed.[3] These parties present a live and concrete dispute, and the district court properly has jurisdiction.[4]

---

2. As the first paragraph of part II.B. below demonstrates, the reach of subsection (b) is so broad that we have no difficulty imagining that Reeves would violate each subparagraph of subsection (b) in any dedicated use of sound equipment, with the exception of subparagraphs 3 and 6. His standing to challenge the entire ordinance is unaffected by such reservations, however, since standing requirements are less demanding when First Amendment freedoms are endangered. In that context, the Supreme Court has traditionally relaxed the normal standing requirements "to take into account possible applications of the statute in other factual contexts besides that at bar", *N.A.A.C.P. v. Button*, 371 U.S. 415, 432, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963). *See, also Village of Schaumberg v. Citizens for a Better Environment*, 444 U.S. 620, 100 S.Ct. 826, 834–35, 63 L.Ed.2d 73 (1980). This extends to granting the plaintiff standing to challenge the entire statutory scheme, regardless of whether he personally would have been injured by each section of the relevant statute, *Freedman v. State of Maryland*, 380 U.S. 51, 55–57, 85 S.Ct. 734, 737 -38, 13 L.Ed.2d 649 (1965), because of "the danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper

applications." *N.A.A.C.P. v. Button*, 371 U.S. at 433, 83 S.Ct. at 338.

3. On May 14, 1978, Reeves was arrested for operating sound amplification equipment inside the city without a permit in violation of section 29 6(a). He is still charged in Houston Municipal Court with the violation of subsection (a), but that pending state charge is not in dispute in this case and is significant only as an indication that subsection (b) itself has vitality. The Houston City Council re- enacted and strengthened subsection (b) on May 16, 1978. Reeves filed suit on May 26, 1978.

4. The city argues that if Reeves' standing to challenge subsection (b) were based upon his arrest under subsection (a), the district court should have dismissed under *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), because such a holding would imply that the two subsections were one statute and there would then be a pending state criminal charge capable of resolving the constitutional questions.

We do not base our affirmance of Reeves' standing on a unitary view of subsections (a) and (b): it is clear that Reeves' prosecution

## II. The Constitutionality of Section 29–6(b)

### A. Supreme Court Precedents and Standards

#### 1. Municipal Regulation of Sound Amplification

The power of municipal governments to regulate the use of sound amplification equipment first came before the Supreme Court in *Saia v. People of State of New York*, 334 U.S. 558, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948). *Saia* recognized that the use of sound amplification equipment within reasonable limits is an aspect of free speech protected by the First Amendment. *Id.* at 561–62, 68 S.Ct. at 1150. The right to communicate inherently comprehends the right to communicate effectively. The mere existence of an alternative means of expression—in this case, unamplified speech—cannot by itself justify a restraint on some particular means that the speaker finds more effective. *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 758 n.15, 96 S.Ct. 1817, 1823 n.15, 48 L.Ed.2d 346 (1976); *Linmark Associates, Inc. v. Township of Willingboro*, 431 U.S. 85, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1971).

At the same time, the Court recognized in *Saia* that when the exercise of First Amendment rights infringes on legitimate state interests, a city may enact narrowly drawn statutes regulating the time, place, and manner of such activities. 334 U.S. at 562, 68 S.Ct. at 1150. Courts then have the task of balancing the legitimate community interests protected by such statutes against the infringement of First Amendment rights, "[b]ut in that process they should be mindful to keep the freedoms of the First Amendment in a preferred position." *Id.* Thus the Supreme Court in *Saia* invalidated a city ordinance which vested in the chief of police uncontrolled discretion to grant or withhold permits for the use of sound amplifying equipment, because such an ordinance could be used to suppress First Amendment rights far more severely than could be justified by the city's narrow interest in preserving the tranquility of the community against excessive noise.

Less than one year later the Court upheld a Trenton, New Jersey, ordinance which prohibited the operation on city streets of any sound amplification equipment making "loud and raucous noises." *Kovacs v. Cooper*, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949). The plurality opinion again emphasized the "preferred position of freedom of speech," but found that "the need for reasonable protection in the homes or business houses from the distracting noises of vehicles equipped with [loud and raucous] sound amplifying devices justifies the ordinance." *Id.* at 89, 69 S.Ct. at 454. Although the exact nature of the original holding in *Kovacs* is obscured by several conflicting opinions,[5] it has been cited by the Court on numerous occasions for the principle announced in the plurality opinion: that the Trenton ordinance was a reasonable regulation of the manner in which First Amendment rights are exercised. *See, e. g., Young v. American Mini Theaters, Inc.*, 427 U.S. 50, 63 n.18, 96 S.Ct. 2440, 2449 n.18, 49 L.Ed.2d 310 (1976); *Virginia State Board of Pharmacy*, 425 U.S. at 771, 96 S.Ct. at 1830.

The judicial task in balancing such regulations against the exercise of First Amend-

under subsection (a) will not require the state court to consider any provision of subsection (b). There is thus no pending state action related to this case, and hence no basis for *Younger* abstention. *Steffel v. Thompson*, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974).

5. Three Justices joined a plurality opinion interpreting the ordinance to ban *only* "loud and raucous" sound amplification and saying in dicta that a total prohibition would "probably" be unconstitutional. 336 U.S. at 82, 69 S.Ct. at 451 (Reed, J.). Two other Justices concurred because they believed even a total prohibition would be constitutional. 336 U.S. at 89–98, 69 S.Ct. at 454–459 (Frankfurter, J. and Jackson, J., concurring). Three other Justices dissented because the record indicated that the state court had enforced the ordinance as a total prohibition of sound amplification on all city streets. 336 U.S. at 98–106, 96 S.Ct. at 459–63 (Black, J., dissenting). The ninth Justice dissented without an opinion.

ment rights was more fully discussed in *Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972), which involved a statute prohibiting picketing that "disturbs or tends to disturb" schools. The analytical starting point is that government has no power to restrict free speech because of its content, but "reasonable 'time, place and manner' regulations may be necessary to further significant government interests, and are permitted." *Id.* at 115, 92 S.Ct. at 2302. The court must "weigh heavily the fact that communication is involved" and require that the regulation "be narrowly tailored to further the State's legitimate interest." *Id.* at 115–17, 92 S.Ct. at 2303–04. "Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." *N.A.A.C.P. v. Button*, 371 U.S. 415, 433, 83 S.Ct. 328, 338 (1963). The statute must "represent a considered legislative judgment that a particular mode of expression has to give way to other compelling needs of society." *Broadrick v. Oklahoma*, 413 U.S. 601, 611–12, 93 S.Ct. 2908, 2915, 37 L.Ed.2d 830 (1973).

### 2. Overbreadth

If, at the expense of First Amendment freedoms, a statute reaches more broadly than is reasonably necessary to protect legitimate state interests, a court may forbid its enforcement. But the Supreme Court has cautioned that invalidation of state laws for facial overbreadth is a remedy that should be applied "sparingly and only as a last resort." *Broadrick*, 413 U.S. at 613, 93 S.Ct. at 2916. Accordingly, we will label a provision of the Houston ordinance unconstitutional only if a limiting construction could not readily be placed on the challenged section, *Dombrowski v. Pfister*, 380 U.S. 479, 491, 85 S.Ct. 1116, 1123, 14 L.Ed.2d 22 (1965), and if the overbreadth of the challenged provision is both real and substantial. *Broadrick*, 413 U.S. at 615, 93 S.Ct. at 2918.

6. Under the Court's opinion in *Hudgens v. NLRB*, 424 U.S. 507, 520 21, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976), the use of shopping centers

### 3. Vagueness

Several provisions of subsection (b) were also challenged and invalidated for vagueness under the due process clause of the Fourteenth Amendment. The traditional standard of unconstitutional vagueness is whether the terms of a statute are so indefinite that "men of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). *See also Hynes v. Mayor and Council of Borough of Oradell*, 425 U.S. 610, 620, 96 S.Ct. 1755, 1760, 48 L.Ed.2d 243 (1976). This standard is applied even more strictly to statutes that inhibit free speech because of the value our society places on the free dissemination of ideas. *Id.* at 620, 96 S.Ct. at 1760. With these standards of review in mind, we turn to the specific provisions of section 29–6(b).

### B. Restrictions as to Time and Place

Subparagraphs 1, 2, and 5 of the ordinance restrict the time and place of the use of sound amplification equipment. Subparagraph 1 prohibits all sound amplification in the downtown business district except for certain hours on Sunday. Subparagraph 2 prohibits all sound amplification throughout the city between 7:00 p. m. and 10:00 a. m. daily and between 10:00 a. m. and 1:00 p. m. on Sunday. Subparagraph 5 prohibits all sound amplification within 100 yards of a hospital, school, church, or courthouse, or within 50 yards of any residence including a hotel or motel. In order to appreciate the degree of restriction these subsections cumulatively impose, it is useful to note that they leave only the following outside areas and times open to the use of *any* form of sound amplification equipment, no matter how low its volume or orderly its presentation:

1) the downtown business district between 1:00 and 7:00 p. m. on Sunday afternoons;

2) parks, industrial areas, and purely commercial areas [6] between 10:00 a. m.

for the exercise of First Amendment activities would depend upon the consent of the owners.

and 7:00 p. m. Monday through Saturday and 1:00 and 7:00 p. m. Sunday;

3) those residential areas where houses are set back from the road at least 50 yards, and then only between the same hours specified in 2), above.

Even these listed areas would be foreclosed if the amplifying equipment were within 50 yards of a residence or hotel, or within 100 yards of a hospital, church, school, or courthouse.

■ The city asserts two justifications for the restrictions contained in subparagraph 1 in regard to the downtown business district: 1) to prevent disruption of the normal business activity on the crowded streets in this district and 2) to prevent distractions of pedestrians and drivers whose full attention is needed elsewhere. The ends which the city seeks to protect are clearly proper, but the blanket prohibition by which it seeks to achieve those ends is far too broad. Not every amplified sound at every time except Sunday afternoon will disrupt the normal business activity of the downtown district or make the streets unsafe. Precisely because the downtown district is already a busy and noisy place, reasonably amplified free speech is guaranteed a broad right to equal participation in these aspects of modern urban life. As the Court stated in *Grayned*, "the nature of a place, 'the pattern of its normal activities, dictate the kinds of regulations of time, place, and manner that are reasonable.' . . . The crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time." *Grayned*, 408 U.S. at 116, 92 S.Ct. at 2303. By this standard, there is probably no more appropriate place for reasonably amplified free speech than the streets and sidewalks of a downtown business district. "[S]treets, sidewalks, parks, and other similar public places are so historically associated with the exercise of First Amendment rights that access to them for the purpose of exercising such rights cannot constitutionally be denied broadly and absolutely." *Hudgens v.*

*NLRB*, 424 U.S. 507, 515, 96 S.Ct. 1029, 1034, 47 L.Ed.2d 196 (1976) (quoting *Amalgamated Food Employees Union v. Logan Valley Plaza*, 391 U.S. 308, 315, 88 S.Ct. 1601, 1606, 20 L.Ed.2d 603 (1968)). The city may tailor its ordinance to reach those activities that actually cause, or immediately threaten to cause, the consequences it fears. *Grayned*, 408 U.S. at 117–21, 92 S.Ct. at 2303–2306. It clearly has not done so in this subparagraph. Accordingly, subparagraph 1 is unconstitutional as an overly broad restriction of protected First Amendment rights.

■ The city attempts to justify the subparagraph 2 restriction on hours of operation as a reasonable means of preserving the tranquility of Sunday morning for religious services and of the evening, night, and early morning hours for rest, quiet reflection, and family togetherness. It is true that when a citizen is within the privacy of his home, the state has broad powers to safeguard his "very basic right to be free from sights, sounds, and tangible matter" he does not want. *Rowan v. United States Post Office*, 397 U.S. 728, 736, 90 S.Ct. 1484, 1490, 25 L.Ed.2d 736 (1970). That legitimate interest of the state is greatly diminished, however, when the citizen is outside his home. In the public spaces of a city one is often required to divert his attention or his path rather than ask the state to silence objectionable speech or reasonably amplified speech. *Erznoznick v. City of Jacksonville*, 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975); *Cohen v. California*, 403 U.S. 15, 21, 91 S.Ct. 1780, 1786, 29 L.Ed.2d 284 (1971). The interest of a citizen in his privacy and tranquility, which the City of Houston seeks to protect in subparagraph 2, is therefore tied to certain locations and spaces. We repeat that "the crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time." *Grayned*, 408 U.S. at 116, 92 S.Ct. at 2303. The city thus must make some effort to tailor its ordinance in relation to *place* as well as time. All sound amplification might

well be incompatible with the normal activity of a purely residential area at 9:00 p. m. or on Sunday morning, but it is quite compatible with the normal activity of a night club district at 9:00 p. m. or a public park on Sunday morning. An absolute and city-wide prohibition of all sound amplification except during nine hours of the day cannot be viewed as "narrowly tailored to further the State's legitimate interest." *Id.* at 116–17, 92 S.Ct. at 2303. Accordingly, subsection 2 is also void as an unconstitutionally overbroad regulation of activities protected by the First Amendment.

■ Subparagraph 5 seeks to protect specific locations where the city has a legitimate interest in preserving privacy and efficient operation: residences,[7] schools,[8] courthouses,[9] hospitals, and churches. But here, in contrast to subparagraph 2, the city protects the location without regard to the time or normal activity of the area. For instance, there can be no valid state interest in prohibiting all sound amplification within 100 yards of schools, courthouses, and churches outside the normal hours of use, as does the City of Houston. And if a residence or hotel is located in an area characterized by noise and activity at a certain hour, amplified free speech may participate in that noise and cannot be absolutely prohibited within a fifty yard protective zone. There is no valid state interest in prohibiting amplified sound that does not actually cause, or imminently threaten to cause, material disruption at these locations.[10] *See, e. g., Grayned,* 408 U.S. at 115–21, 92 S.Ct. at 2302–06; *Cox v. Louisiana,* 379 U.S. 559, 562–64, 85 S.Ct. 476, 479–80, 13 L.Ed.2d 487 (1965). The Supreme Court has consistently found that an "undifferentiated fear or apprehension of disturbance is not enough

to overcome the right to freedom of expression." *Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 508, 89 S.Ct. 733, 737, 21 L.Ed.2d 731 (1969). Because subparagraph 5 sweeps so much more broadly than is necessary to protect the city's legitimate interests, it is also void for unconstitutional overbreadth.

### C. Restrictions as to Manner

■ Subparagraphs 4, 6, and 7 regulate the manner of use of sound amplification equipment. The first of these provisions requires sound trucks to move at a speed of at least 10 m. p. h. unless impeded or stopped by the flow of traffic and to cease broadcasting one minute after being stopped. The city argues that the operation of a sound truck in any other manner would constitute a traffic hazard and create danger for both motorists and pedestrians. At the same time, the city offers no evidence to support this broad claim. Such a generalization is undoubtedly true in certain times, places and situations—but not always. The city may define a traffic hazard or an unsafe speed of operation for any vehicle and apply the same standard to a sound truck. But if other vehicles are allowed to move slowly or stop on a certain street, a sound truck may also do so until it has actually created, or imminently threatens to create, the same kind of material disruption or danger to traffic and pedestrians that would be objectionable if caused by any other vehicle or activity. This subparagraph is not narrowly tailored to protect the city's legitimate interests, and is accordingly void for unconstitutional overbreadth.

■ Subparagraph 6 requires the volume of sound amplification to be controlled

---

7. *Rowan,* 397 U.S. at 736 37, 90 S.Ct. at 1490.

8. *Grayned,* 408 U.S. at 120, 92 S.Ct. at 2305.

9. *Cox v. Louisiana,* 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965).

10. We note that a "material disruption" may occur at a much lower threshold level of noise in areas of a city which are primarily residential because the state may act to protect the privacy of the home from uninvited noise.

*Rowan,* 397 U.S. at 736, 90 S.Ct. at 1490. We do not decide in this case how far the city may go, but the erection of an absolute 50-yard protective zone around all residences, hotels, and motels is clearly too far. It bears emphasis that the controlling factor is not the presence of a single residence but the "pattern of . . . normal activities" of a particular locale at a particular time. *Grayned,* 408 U.S. at 116, 92 S.Ct. at 2303.

so that it is not "unreasonably loud, raucous, jarring, disturbing, or a nuisance to persons within the area of audibility." The district court found that the terms "unreasonably" and "nuisance" are imprecise, do not give the ordinary person fair notice of prohibited conduct, and allow arbitrary and discriminatory enforcement by officials. The court therefore found this subparagraph to be void for vagueness under the Fourteenth Amendment. We disagree. The Supreme Court has approved the use of the word "unreasonably" in similar statutes that are otherwise precise and narrowly drawn. *Cameron v. Johnson*, 390 U.S. 611, 615–16, 88 S.Ct. 1335, 1338, 20 L.Ed.2d 182 (1968). The Court has also approved the terms "loud" and "raucous" as standards of prohibited sound amplification. Though these words are abstract, "they have through daily use acquired a content that conveys to any interested person a sufficiently accurate concept of what is forbidden." *Kovacs v. Cooper*, 336 U.S. 77, 79, 69 S.Ct. 448, 450, 93 L.Ed. 513 (1949).[11] We approve the words "jarring" and "nuisance" on the same grounds, even though they fall short of providing "mathematical certainty." *Grayned*, 408 U.S. at 110, 92 S.Ct. at 2299. "Flexibility and reasonable breadth, rather than meticulous specificity," is acceptable in this area. *Id.*

The remainder of the prohibitory language in subparagraph 6, "disturbing . . . to persons within the area of audibility", presents a closer question. The Supreme Court has expressed reservations about the word "disturbs" in a similar ordinance. But in the expectation that a state court would interpret the term objectively to mean "actual or imminent interference with . . . 'peace or good order' ", the Court eventually found the term not unconstitutionally vague or overbroad. *Grayned*, 408 U.S. at 109–112, 92 S.Ct. at 2299–01. We have a similar expectation with regard to subparagraph 6. If actual experience with the *ordinance were to demonstrate* that it represents a subjective standard, prohibiting a volume that *any individual* person "within

the area of audibility" happens to find *personally* "disturbing," we would not hesitate to change our judgment accordingly. Taking subparagraph 6 as a whole, we must at this time reverse the district court's finding that it is unconstitutionally vague.

■■■■ Subparagraph 7 prohibits the operation of any sound amplification equipment "with an excess of twenty (20) watts of power in the last stage of amplification." At trial the plaintiff made much of the fact that a regulation based upon decibels at the point of hearing, rather than watts at the point of amplification, would more precisely relate to the city's interest in keeping sound within non–disruptive levels. That is undoubtedly true, and the district court used the existence of this "least restrictive means" as the basis of finding subparagraph 7 unconstitutionally overbroad. But the requirement that a statute be "narrowly tailored" is only one factor in answering the ultimate question whether the regulation is "reasonable." *Grayned*, 408 U.S. at 116–17, 92 S.Ct. at 2303. Consequently, a city is not required to adopt the least restrictive means of regulation no matter what the consequences, but the reasonableness of its decision will be viewed "in the light of less drastic means for achieving the same basic purpose." *Shelton v. Tucker*, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960). Administrative convenience is certainly a proper factor for the City of Houston to weigh in choosing one standard of regulation over another. *International Society for Krishna Consciousness v. Eaves*, 601 F.2d 809, 829–30 (5th Cir. 1979). The plaintiff's own expert testified that enforcement of a decibel–based regulation is a "very, very complex issue" due to the infinite number of points of measurement, as was demonstrated in *U.S. Labor Party v. Pomerleau*, 557 F.2d 410 (4th Cir. 1977). The record clearly supports the city's contention that a watts–based regulation is reasonable: the small gain in precision is more than offset by a substantial

---

11. We noted in the text accompanying footnote 3 *supra* that any doubts about the meaning of

*Kovacs* have been dispelled by its frequent citation as precedent on this point.

loss of administrative convenience. We therefore disagree with the district court's holding that a wattage–based regulation is inherently overbroad.

 But the number of watts chosen as the point of regulation must also be reasonable. The district court made no finding as to this issue because it invalidated subparagraph 7 solely on the grounds that it is wattage–based. Our examination of the record shows that the plaintiff's expert witness testified that sound amplification in excess of 20 watts could be non–disruptive. The city did not offer any contrary evidence, and thus conclusively failed to meet its burden of justifying the regulation. *Tinker*, 393 U.S. at 509, 89 S.Ct. at 738. Accordingly, we must declare subparagraph 7 unconstitutionally overbroad to the extent that it is limited to 20 watts.

### D. Restrictions as to Content

 Subparagraph 3, prohibiting the amplification of words or sounds that are "obscene or slanderous," is the only provision of section 29–6(b) which operates as a prior restraint on the *content* of the sounds and speech amplified, rather than merely the time, place, and manner. As such, it is subject to an even more exacting judicial scrutiny. *Police Dept. of City of Chicago v. Mosley*, 408 U.S. 92, 96–100, 92 S.Ct. 2286, 2290–92, 33 L.Ed.2d 212 (1972). The district court found the subparagraph 3 prohibition of "obscene" sounds to be unconstitutionally overbroad because it did not specifically state that only "erotic" sounds could be prohibited under *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). We disagree and reverse the district court. The Supreme Court has stated that the First Amendment has a special meaning in the context of broadcasting. Because broadcast speech exposes the public to uninvited or even unwelcome speech in a manner that often gives the listener no completely effective means of avoidance, the state may act to impose sanctions on those who use "obscene, indecent, or profane language" during broadcasts. *F.C.C. v. Pacifica Foundation*, 438 U.S. 726, 98 S.Ct. 3026,

3039–41, 57 L.Ed.2d 1073 (1978). Amplified speech on public streets creates a parallel situation when it is given the broad rights that we affirm in this opinion. The citizen on the streets who encounters amplified speech cannot voluntarily divert his attention or his path, or that of his family and children, to avoid the objectionable material, as he usually can in regards to printed or unamplified speech. For that reason the City of Houston may prohibit all obscene content in speech and sounds that will be amplified, and is not restricted to specifically "erotic" speech under *Miller*.

The plaintiff also raised a vagueness challenge to the "obscene" provision of subparagraph 3. The Supreme Court has previously decided that this term is precise enough to convey "sufficiently definite warning . . . when measured by common understanding and practices." *Roth v. United States*, 354 U.S. 476, 491–92, 77 S.Ct. 1304, 1212–13, 1 L.Ed.2d 1498 (1957), quoting *United States v. Petrillo*, 332 U.S. 1, 8, 67 S.Ct. 1538, 1542, 91 L.Ed. 1877 (1947). The plaintiff's argument is thus without merit.

 The district court invalidated the subparagraph 3 prohibition of "slanderous" speech on grounds of unconstitutional vagueness. The district court reasoned that the common law of slander and libel has been greatly modified by the Supreme Court in a series of landmark cases beginning with *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Under this line of cases, certain forms of common–law defamation are now protected by the First Amendment, such as statements about public officials unless made with knowledge of the statement's falsity or reckless disregard for its accuracy. *Id.*, 376 U.S. at 279–83, 84 S.Ct. at 725–27. The Houston ordinance makes no attempt to distinguish the specific forms of slander that the city may constitutionally prohibit. That overbreadth exerts a substantial chill upon speech that is close to the heart of the First Amendment, because it places the speaker in doubt regarding what he may say in amplified speech about public officials and public figures. The Eighth

Circuit has held similar language in 18 U.S.C. § 1718 to be unconstitutionally overbroad for not defining its proper reach more specifically. *Tollett v. United States*, 485 F.2d 1087, 1097–98 (8th Cir. 1973). We adopt the same analysis as to this term in the Houston ordinance. Houston may constitutionally prohibit certain forms of slanderous speech, but it must do so with specificity and clarity. The mere word "slanderous" in this ordinance is unconstitutionally vague and overbroad under the Fourteenth and First Amendments.

### III. Conclusion

Throughout this opinion we have affirmed the ability of the City of Houston to legislate in this area. We are certain that most citizens desire protection from unreasonable or disruptive levels of noise on the streets and from uninvited noise within the privacy of their homes. We say nothing today that prevents the city from granting that protection. When the city fears disruption, it may prohibit conduct that actually causes, or imminently threatens to cause, material and substantial disruption of the community or invasion of the rights of others. *Tinker*, 393 U.S. at 513, 89 S.Ct. at 740. Or the city may reasonably prohibit kinds or degrees of sound amplification that are clearly incompatible with the normal activity of certain locations at certain times. *Grayned*, 408 U.S. at 116, 92 S.Ct. at 2303. But the city may not broadly prohibit reasonably amplified speech merely because of an undifferentiated fear that disruption might sometimes result. When First Amendment freedoms are involved, the city may protect its legitimate interests only with precision. The City of Houston has fallen far short of that goal in section 29–6(b).

Accordingly, we agree with the district court that subparagraphs 1, 2, 4, 5 and 7 are void because they unnecessarily infringe upon rights protected by the First Amendment. We also agree with the district court that the term "slanderous" in subparagraph 3 is void for vagueness under the due process clause of the Fourteenth Amendment, and we additionally find it overbroad in violation of the First Amendment. We reverse the district court holding that subparagraph 6 and the term "obscene" in subparagraph 3 are unconstitutionally vague.

AFFIRMED IN PART, REVERSED IN PART.