**Roselyn LIONHART, et al.**

v.

**M.J. "Mike" FOSTER and Richard J. Pennington**

No. CIV. A. 99–2844.

United States District Court, E.D. Louisiana.

Oct. 27, 1999.

Mary E. Howell, Howell & Snead, New Orleans, LA, Samuel S. Dalton, Jefferson, LA, for Plaintiffs.

Mary Ellen Hunley, Louisiana Dept. of Justice Atty. General's Office, Baton Rouge, LA, for Defendant.

Annabelle Hoppe Walker, City Atty's Office City Hall, New Orleans, LA, for City of New Orleans.

## ORDER AND REASONS

VANCE, District Judge.

Plaintiffs, Roselyn Lionhart, David Leonard, Scott Kirby, Anthony Lacen, David Glen Andrews, Anthony Bennett, Cherice Harrison Nelson, individually and on behalf of her minor son Brian Nelson,

and Pat Bryant, on behalf of themselves and all those similarly situated, move to enjoin enforcement of La.Rev.Stat. § 14:103.2, a Louisiana anti-noise statute which took effect on August 15, 1999. The Court issued a temporary restraining order against the enforcement of this statute on September 17, 1999 and set the case for a consolidated hearing on the preliminary injunction and trial on the merits. Because the statute is unconstitutionally vague and overbroad in violation of the First and Fourteenth Amendments to the United States Constitution, the Court hereby GRANTS plaintiffs' motion for preliminary and permanent injunctive relief.

## I. BACKGROUND

Plaintiffs are street musicians, brass brand musicians, Mardi Gras Indians, Mardi Gras and Second Line parade participants, and a political/civil rights activist. The street musicians sing and play musical instruments in the public streets and areas encompassing Jackson Square in New Orleans. They perform while church services are being conducted at St. Louis Cathedral, which is located in Jackson Square. Plaintiffs' activities must conform to New Orleans City Ordinance 66–208, which permits street musicians to perform as long as their music does not exceed 78 decibels measured at 50 feet from the sound source during posted services inside the cathedral. The city ordinance also provides that, if the music exceeds the 78 decibel level, the musicians will receive a warning before any enforcement action is taken. The other plaintiffs participate and perform in parades and political activities in the public streets of New Orleans.

The statute at issue was designed to create "quiet zones" in public places around hospitals and places of religious worship. *See* La.Rev.Stat. § 14:103.2. It carries criminal penalties and regulates producing sound in public places in excess of 55 decibels, as measured within ten feet

of the entrance to hospitals and places of worship. The statute provides:

A. No person shall operate or play any sound producing device or sound amplification device in a public street, public park or other public place in a manner likely to disturb, inconvenience, or annoy a person of ordinary sensibilities, if the sound produced is in excess of fifty-five decibels as measured within ten feet of the entrance to:

(1) Hospitals.

(2) Churches, synagogues, temples or other houses of religious worship,[1] while the building is occupied and services are being performed, provided that a sign is posted within ten feet of the front door when services are being performed.

B. Whoever violates any of the provisions of this Section shall be imprisoned for not more than thirty days.

1999 La. Sess. Law Serv. Act 1227 (West).

Plaintiffs seek to enjoin the enforcement of the anti-noise provision on two grounds: (1) it constitutes an impermissible burden on the exercise of their constitutional rights of free speech, expression, and association under the First and Fourteenth Amendments; and (2) it unconstitutionally delegates to religious authorities the power to control and suppress free speech, in violation of the First Amendment's Establishment Clause. Plaintiffs allege that they will suffer irreparable injury if this statute is enforced because they and those similarly situated face a substantial and immediate threat of detention, arrest, prosecution, and imprisonment.

## II. ANALYSIS

### A. Legal Standard

■ The standard for obtaining a permanent injunction is essentially the same as for a preliminary injunction. *See Calmes v. United States*, 926 F.Supp. 582, 591 (N.D.Tex.1996). In both cases, the

---

1. For purposes of this order, the Court will refer to the "houses of religious worship" identified in the statute collectively as "churches."

moving party must show a substantial threat of irreparable injury if the injunction is not granted; the threatened injury to the moving party outweighs any potential harm to the non-movant; and the injunction will not disserve the public interest. *See id.* (*citing United States v. The Rainbow Family,* 695 F.Supp. 314 (E.D.Tex.1988)). *See also Valley v. Rapides Parish Sch. Bd.,* 118 F.3d 1047, 1051 (5th Cir.1997); *Cherokee Pump & Equip. Inc. v. Aurora Pump,* 38 F.3d 246, 249 (5th Cir.1994); *Mississippi Power & Light Co. v. United Gas Pipe Line Co.,* 760 F.2d 618, 621 (5th Cir.1985). However, the plaintiff seeking a permanent injunction must demonstrate actual success on the merits, rather than a substantial likelihood of success. *See Calmes,* 926 F.Supp. at 591–92 (*citing Amoco Production Co. v. Village of Gambell, Alaska,* 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 1404 n. 12, 94 L.Ed.2d 542 (1987)). The Fifth Circuit has held that "[i]njunctive relief is an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion." *Holland America Ins. Co. v. Succession of Roy,* 777 F.2d 992, 997 (5th Cir.1985).

## B.  Actual Success on the Merits

### 1.  Freedoms of Speech, Expression and Association

#### a.  Overbreadth

Plaintiffs argue that the statute at issue is unconstitutionally overbroad on its face. A statute is overbroad if it reaches more broadly than is reasonably necessary to protect legitimate state interests at the expense of First Amendment freedoms. *See Grayned v. City of Rockford,* 408 U.S. 104, 114, 92 S.Ct. 2294, 2302, 33 L.Ed.2d 222 (1972); *Reeves v. McConn,* 631 F.2d 377, 383 (5th Cir.1980).

■ Music is protected under the First Amendment as a form of expression and communication. *See Ward v. Rock Against Racism,* 491 U.S. 781, 790, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989). The First Amendment also protects the use of sound amplification equipment. *See Saia v.. People of New York,* 334 U.S. 558, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948); *Beckerman v. City of Tupelo,* 664 F.2d 502, 515 (5th Cir.1981). Nevertheless, it is well established that governmental entities have a substantial interest in protecting citizens from excessive noise in traditional public fora such as city streets and parks. *See Ward,* 491 U.S. at 796–97, 109 S.Ct. at 2756 (citations omitted); *Kovacs v. Cooper,* 336 U.S. 77, 86–86, 69 S.Ct. 448, 453–54, 93 L.Ed. 513 (1949). Governments may impose reasonable time, place and manner restrictions to further their legitimate interests. *See Grayned,* 408 U.S. at .116, 92 S.Ct. at 2303. They are not required to adopt the least restrictive or least intrusive means of regulating protected speech. *See Ward,* 491 U.S. at 798, 109 S.Ct. at 2757–58.

■ Nevertheless, regulations restricting speech must be content neutral, narrowly tailored to serve a significant governmental interest and must leave open ample alternative channels of communication. *See id.* The main issue in determining content neutrality is whether the government has adopted the regulation because of "disagreement with the message it conveys." *Id.* at 791, 109 S.Ct. at 2754. As long as the regulation is "justified without reference to the content of the regulated speech," the regulation is content neutral. *Id.* (*quoting Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984)). The Court finds that the statute at issue here is content neutral. The stated purpose of the statute is to create "quiet zones" around hospitals and churches, and the operation of the statute does not hinge on the content of the regulated speech. *See id.* at 791–92, 109 S.Ct. at 2754; *United States v. Doe,* 968 F.2d 86, 88 (D.C.Cir.1992). Plaintiffs do not even suggest that the statute is

designed to regulate speech of any specific content.

The Court's inquiry will therefore focus on whether the statute is "narrowly tailored" to further a legitimate state interest. The Court must consider the nature of the place where speech is regulated and the "pattern of ... normal activities" there to determine whether the regulation is reasonable. *See Grayned*, 408 U.S. at 116, 92 S.Ct. at 2303. In analyzing whether the state's regulation is narrowly tailored, "[t]he crucial question" is whether the regulated expression is "basically incompatible with the normal activity of a particular place at a particular time." *Id.* When First Amendment freedoms are implicated, the Court must place these freedoms in a preferred position. *See id.; accord Reeves*, 631 F.2d at 383. The government bears the burden of justifying its regulation as narrowly tailored. *See Doe*, 968 F.2d at 90.

The state's asserted interest in preserving the tranquility of the community against excessive noise is clearly legitimate. *See Ward*, 491 U.S. at 796, 109 S.Ct. at 2756; *Kovacs*, 336 U.S. at 87–88, 69 S.Ct. at 453–54; *Reeves*, 631 F.2d at 384. However, the importance of First Amendment freedoms necessitates that the state regulate in this area only with narrow specificity.

When the government chooses to prohibit sound levels in public places that are not demonstrably disturbing, the courts will reject the regulation as overly broad. For example, in *Reeves v. McConn*, the Fifth Circuit invalidated a Houston ordinance prohibiting the operation of sound amplifying equipment in excess of 20 watts within 100 yards of any hospital, school, church, or courthouse. 631 F.2d at 381 n. 1. The court noted that "there is probably no more appropriate place for reasonably amplified speech than the streets and sidewalks of a downtown business district." *Id.* at 384. *See also Beckerman v. City of Tupelo*, 664 F.2d at 516 ("Because this ordinance extends its total and non-discre-tionary prohibition to areas which have not been shown to be incompatible with sound equipment, it is unconstitutionally overbroad."). The court stated that, in addition to the "narrowly tailored" requirement, the number of watts chosen as the point of regulation must also be reasonable. *See Reeves*, 631 F.2d at 387. The city could not broadly prohibit reasonably amplified speech simply because it feared that disruption might sometimes result. *See id.* at 388. Relying on the plaintiff's uncontroverted expert testimony that sound amplification in excess of 20 watts could be non-disruptive, the court held the ordinance unconstitutionally overbroad to the extent that it limited the sound level to 20 watts. *See id.* at 387–88. The Fifth Circuit stated that "there is no valid state interest in prohibiting amplified sound that does not actually cause, or imminently threaten to cause, material disruption at these [schools, churches, courthouses] locations." *Id.* at 385.

On similar facts, the District of Columbia Circuit struck down a federal regulation which prohibited the playing of musical instruments at a level higher than "60 decibels measured on the A-weighted scale at 50 feet." *Doe*, 968 F.2d at 89–90. Defendants there were arrested under the regulation for chanting and beating drums in Lafayette Park across from the White House during a war protest. *See id.* at 87. The court observed that " 'excessive' noise by definition means something above and beyond the ordinary noises associated with the appropriate and customary uses of the park." *Id.* at 89. The defendant proffered evidence that loud conversations exceed 60 decibels, and the government offered nothing to show that the chosen decibel level prohibited only disturbing or excessive speech activity. *See id.* at 90–91 ("Where constitutionally protected activity is implicated, we cannot simply defer to the Park Service's unexplained judgment."). The court therefore found that the government failed to carry its burden of showing that the regulation was narrow-

ly tailored to further its interest in preventing excessive noise in a traditional public forum. *See id. See also U.S. Labor Party v. Pomerleau,* 557 F.2d 410, 413 (4th Cir.1977) (invalidating city anti-noise ordinance when decibel level prohibited noise no greater than person speaking slightly louder than normal); *Maldonado v. County of Monterey,* 330 F.Supp. 1282, 1286 (N.D.Cal.1971) (finding unconstitutional county ordinance prohibiting any amplification of human voice above normal speaking level from all public highways).

■ Here, La.Rev.Stat. § 14:103.2 regulates the production of sound in excess of 55 decibels within 10 feet of hospitals or churches during posted services. Unlike the cited cases, however, the Louisiana statute does not flatly prohibit the production of sound in excess of the stated decibel level. Rather, producing sound above this level in these locations can be prosecuted if one does so "in a manner likely to disturb, inconvenience, or annoy a person of ordinary sensibilities." La.Rev.Stat. § 14:103.2. The Court concludes, however, that because the 55 decibel level threshold is so unreasonably overbroad in the context of normal activities on public streets and in public parks, the added requirement that the sound be made in a manner that is likely to annoy or disturb someone does not save it.

Plaintiffs presented uncontroverted evidence that 55 decibels includes the sound of the human voice in normal conversation, as well as passing automobile traffic. (*See* Pls.' Ex. 11, Expert Audiologist's Report.) The regulation at issue applies to public streets and parks in New Orleans, the very heart of a city favored by citizens and tourists alike for a culture grounded in live music and outdoor celebration. Hospitals and churches exist all over the city in areas saturated in the sounds of urban life. Various Mardi Gras and other holiday parades take place on public streets, pass within 10 feet of many hospitals and churches, and produce sounds well in excess of the human voice in normal conversation. As in *Reeves* and *Doe,* the state has not offered any evidence to rebut plaintiffs' assertion that the 55 decibel level reaches sound that is not actually disturbing or excessive. Because the Louisiana statute exposes citizens to criminal prosecution for making sounds well within the normal range for city streets and in city parks, the added requirement that the sound be likely to annoy, disturb or inconvenience someone does not prevent it from being overly broad. The Court reaches this conclusion because the "likely to ... annoy ..." standard, in the context of this statute, is vague. *See* discussion *infra.* By using this amorphous concept as a basis for prosecuting the making of sound on a public street at the level of a normal human conversation, which simply is not disturbing, the statute invites prosecution based on subjective factors or worse, distaste for the content of the sound and not its decibel level. *See Dupres v. City of Newport,* 978 F.Supp. 429, 435 (D.R.I. 1997). For this reason, the Court concludes that the statute is not narrowly tailored to serve the state's legitimate interest. Accordingly, the Court finds the statute unconstitutionally overbroad.[2]

**b. Vagueness**

■ An ordinance is void for vagueness under the due process clause of the Four-

2. In contrast to § 14:103.2, the city of New Orleans recently revamped its excessive noise ordinance. *See* NEW ORLEANS CODE, § 66–136, *et seq.; Mellen v. City of New Orleans,* 1998 WL 614187, at *5 (E.D.La. Sept.11, 1998) (*citing Lionhart v. City of New Orleans,* No. 96–1869 (E.D. La. June 11, 1996)). Section 66–208 of the new city ordinance creates a buffer zone around St. Louis Cathedral and limits noise there to less than 78 decibels as measured at 50 feet from the source during religious services in the cathedral, provided conspicuous signs are posted outside. This ordinance demonstrates that the state can effectively balance the competing interests of religious institutions and the public's First Amendment rights by drafting narrowly tailored statutes that take into consideration the normal uses and ambient characteristics of the location. *See Mellen,* 1998 WL 614187, at *5.

teenth Amendment unless it provides fair warning of prohibited conduct and explicit standards for enforcement. *See Reeves,* 631 F.2d at 383; *Pomerleau,* 557 F.2d at 413. Vague laws violate the principle that the law give a person of ordinary intelligence a reasonable opportunity to know what is prohibited so that he may act accordingly. *See Grayned,* 408 U.S. at 108, 92 S.Ct. at 2298–99. The void-for-vagueness doctrine also aims at arbitrary and discriminatory enforcement. *See Kramer v. Price,* 712 F.2d 174, 176 (5th Cir.1983) *(quoting Kolender v. Lawson,* 461 U.S. 352, 361, 103 S.Ct. 1855, 1858–59, 75 L.Ed.2d 903 (1983)). As the Supreme Court stated in *Grayned, supra,* "if arbitrary and discriminatory enforcement is to be prevented," the law must provide "explicit standards" for those who enforce it. 408 U.S. at 108, 92 S.Ct. at 2299. In the First Amendment area, a vague criminal statute operates to inhibit the exercise of protected activities because citizens will inevitably steer a wider course around the unlawful zone when they cannot clearly discern where illegality begins and ends. *See id.* at 109, 92 S.Ct. at 2299 (citations omitted).

■ Here, plaintiffs first assert that the statute is unconstitutionally vague because a person of common intelligence must guess at its meaning and therefore is not placed on notice as to its application. *See Reeves,* 631 F.2d at 383 (citation omitted). In particular, plaintiffs challenge the use of the terms "in a manner likely to disturb, inconvenience, or annoy," "a person of ordinary sensibilities," "other houses of religious worship," "services," "sign," and "occupied." At the outset, the Court confirms that "[p]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Ward,* 491 U.S. at 794, 109 S.Ct. at 2755 (citations omitted). *See also Grayned,* 408 U.S. at 110, 92 S.Ct. at 2300 ("Condemned to the use of words, we can never expect mathematical certainty in our language"). Nevertheless, for the following reasons,

the Court finds the language "in a manner likely to . . . annoy" in the context of this statute to be unconstitutionally vague.

In *Coates v. City of Cincinnati,* 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971), the United States Supreme Court struck a criminal statute that used the word "annoy." *Coates* involved an Ohio law that made it a crime for three or more individuals to assemble on public sidewalks and to conduct themselves in a manner annoying to passersby. *See id.* at 612 n. 1, 91 S.Ct. at 1687 n. 1. The Court found the word "annoy" inherently vague. *See id.* at 614, 91 S.Ct. at 1688.

> Conduct that annoys some people does not annoy others. Thus, the ordinance is vague, not in the sense that it requires a person to conform his conduct to an imprecise but comprehensive normative standard, but rather in the sense that no standard of conduct is specified at all. As a result, "men of common intelligence must necessarily guess at its meaning."

*Id. (quoting Connally v. General Constr. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926)). The Court also criticized the statute because it did not specify upon whose sensitivity a violation depends—"the judge or jury, the sensitivity of the arresting officer, or the sensitivity of a hypothetical reasonable man." *Id.* at 613, 91 S.Ct. at 1688. Finally, the Court found the statute constitutionally infirm because the State cannot make criminal the exercise of First Amendment rights simply because the "exercise may be 'annoying' to some people." *Id.* at 615, 91 S.Ct. at 1689.

> If this were not the rule, the right of the people to gather in public places for social or political purposes would be continually subject to summary suspension through the good-faith enforcement of a prohibition against annoying conduct. And such a prohibition, in addition, contains an obvious invitation to discriminatory enforcement against those whose association together is 'annoying' because their ideas, their lifestyle, or their

physical appearance is resented by the majority of their fellow citizens.

*Id.* at 615–16, 91 S.Ct. at 1689.

This Court finds *Coates'* rationale applicable here. Like *Coates*, the statute at issue uses the inherently vague word "annoy." It is true that the statute determines what is annoying from the vantage point of the person of ordinary sensibilities, a feature notably absent in *Coates*. However, this language does not add clarity because the 55 decibel level threshold includes sound levels that the average person would assume are not annoying or disturbing, so that the statute does not provide fair notice as to what would transform normal sound levels into criminal conduct. There is simply no objective way to determine when sound at a level that is ordinarily not annoying becomes criminally annoying.

The Court is mindful that use of the cited language in a criminal statute proscribing a different kind of behavior in a different context might be constitutionally permissible. *See Kramer,* 712 F.2d at 177 & 177 n. 6 (invalidating Texas anti-harassment statute which prohibited obscene phone calls or writings that "annoy or alarm recipient" but suggesting statute could be saved if it prohibited annoying "hypothetical reasonable person"). The difference here is that the language is not used in the context of a statute with an intent element or involving one-on-one misconduct, like making obscene phone calls, which limits the vagueness of the word "annoy." Rather, the Louisiana statute deals with making sounds on a public street or in a public park near a church or hospital. When combined with the demonstrably overbroad 55–decibel threshold, there is nothing about this context that suggests what it would take to make sound at the level of a normal human conversation criminally annoying. The Court therefore concludes that the statute is unconstitutionally vague.

The Court finds unpersuasive, however, plaintiffs' arguments that a person of ordinary intelligence would not understand the statute's reference to "houses of religious worship," "services," and "occupied" when used in context with "churches, synagogues, [and] temples." Finally, plaintiffs argue that the statute is unconstitutionally vague as it would permit churches to post any kind of "sign." The Court disagrees and finds that, given the statutory context of church services held while the building is occupied, it is reasonable to expect that an enforcement official would interpret "sign" objectively to mean a sign indicating that services are ongoing.

■■■ Plaintiffs also argue that the statute invites discriminatory enforcement because it does not specify the standards to be used to measure sound levels. Plaintiffs produced evidence, which was not contradicted, that at least six different weighting scales are available and that the selection of any one scale over another may result in a significant variation in measurements. (*See* Pls.' Ex. 11, ¶ 9.) However, plaintiffs cite no authority, and the Court has found none, holding that the absence of a specified measurement standard would invalidate an otherwise reasonable decibel limitation. While the Court believes that it is preferable to state the decibel measurement standard in the statute, it does not find that a failure to do so alone renders the statute unconstitutionally vague. *See generally Jim Crockett Promotion, Inc. v. City of Charlotte,* 706 F.2d 486 (4th Cir.1983) (upholding city anti-noise ordinance prohibiting sound volume exceeding certain decibel levels, as measured by sound level meter in accordance with American National Standards Institute guidelines); *Dupres,* 978 F.Supp. at 433 (provision measuring decibel level by "A-scale" not void for vagueness).

## 2. Establishment Clause

■■■ Plaintiffs argue that paragraph (A)(2) of the statute unconstitutionally delegates to religious authorities the power to control and suppress plaintiffs' protected

speech activities, in violation of the Establishment Clause of the First Amendment. The test announced in *Lemon v. Kurtzman* governs Establishment Clause cases. *See Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971); *Freiler v. Tangipahoa Parish Board of Education,* 185 F.3d 337, 344 (5th Cir.1999) (*citing Lemon*); *Agostini v. Felton,* 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997). Under *Lemon,* state action violates the Establishment Clause if (1) it lacks a secular purpose; (2) its primary effect either advances or inhibits religion; or (3) it excessively entangles government with religion. 403 U.S. at 612–13, 91 S.Ct. at 2111.

### a. Secular Purpose

Plaintiffs argue that the statute fails the first prong of *Lemon* because it has no secular purpose. The Court disagrees. The pertinent question is whether the government's actual purpose is to endorse or disapprove of religion. *See Lynch v. Donnelly,* 465 U.S. 668, 690, 104 S.Ct. 1355, 1368, 79 L.Ed.2d 604 (1984). The requirement of a secular purpose does not mean that the challenged state action was "enacted in furtherance of exclusively, or even predominately, secular objectives." *Freiler,* at 344 (*citing Wallace v. Jaffree,* 472 U.S. 38, 56, 105 S.Ct. 2479, 2489, 86 L.Ed.2d 29 (1985)). Moreover, the courts defer to the state's articulation of a secular purpose. *See id.* (citation omitted); *Doe v. Beaumont Independent Sch. Dist.,* 173 F.3d 274, 286 (5th Cir.1999). The purpose must nevertheless be sincere and not a sham. *See Edwards v. Aguillard,* 482 U.S. 578, 583, 107 S.Ct. 2573, 2577, 96 L.Ed.2d 510 (1987).

■ Here, the state asserts that La. Rev.Stat. § 14:103.2 serves to protect the well-being and tranquility of the community from excessive noise. (*See* Def.'s Resp. Mot. Prelim. Inj., at 7.) As discussed *supra,* the state has a substantial and legitimate interest in protecting its citizens from excessive noise, even in traditional public fora. Plaintiffs offer no evidence

from the statute's legislative history or otherwise to suggest that the state's avowed secular purpose in enacting the antinoise ordinance is a "sham." *See Edwards,* 482 U.S. at 587, 107 S.Ct. at 2579 (finding in legislative history of Louisiana creation-science act evidence of purpose to promote religion); *Freiler,* 185 F.3d 337, 344. Accordingly, plaintiffs have not satisfied the first prong of *Lemon.*

### b. Advances Religion

Plaintiffs argue that the statute violates the second prong of the *Lemon* test by advancing religion. A governmental action does not advance religion when the "benefit to religion or to a church is no more than indirect, remote, or incidental." *Freiler,* 185 F.3d 337, 345. Plaintiffs rely on the Supreme Court's ruling in *Larkin v. Grendel's Den, Inc.,* 459 U.S. 116, 103 S.Ct. 505, 74 L.Ed.2d 297 (1982). However, *Larkin* is distinguishable from the facts of this case. The Massachusetts statute invalidated there gave churches the power to veto applications for liquor licenses within five hundred feet of a church. *See id.* at 117, 103 S.Ct. at 507. The Supreme Court affirmed the First Circuit's holding that the statute advanced religion by conferring upon churches a valued benefit or power. *See id.* The benefit at issue in *Larkin* was substantial, giving churches the absolute discretion "to confer or withhold an important commercial privilege in a teeming business and entertainment area." *Grendel's Den, Inc. v. Goodwin,* 662 F.2d 102, 104–05 (1st Cir.1981) (*en banc*), *aff'd sub. nom., Larkin,* 459 U.S. 116, 103 S.Ct. 505, 74 L.Ed.2d 297 (1982). In contrast to *Larkin,* the statute here does not give any exceptional or preferred benefit to a religious institution to withhold or grant within its sole discretion. Churches do not enforce the statute and are not the only category of possible complainants.

### c. Excessive Entanglement

Finally, plaintiffs argue that the statute violates the third prong of the *Lemon* test

because it unconstitutionally delegates governmental power to churches to turn the statute "off" and "on" by displaying or not displaying a sign at their whim or caprice. Plaintiffs again rely on *Larkin* for this conclusion. The churches' power under the statute in *Larkin* was absolute and standardless, simply requiring the church to "object" to issuance of a liquor license. *See id.* at 125, 103 S.Ct. at 511. Therefore, the Court found that the statute "substitute[d] the unilateral and absolute power of a church for the reasoned decisionmaking of a public legislative body" and enmeshed churches in the processes of government. *Id.* at 127, 103 S.Ct. at 512.

Plaintiffs' argument distorts the role churches play under the Louisiana statute. The Louisiana anti-noise statute does not permit a church to silence plaintiffs unilaterally, without the intervention of any government authority, simply by posting a sign at its caprice. The statute applies only to restrict noise near churches when a sign is posted, the building is occupied, and services are ongoing. The churches' ability to post signs is therefore limited to statutory conditions. As the *Larkin* court recognized, "[s]ome limited and incidental entanglement between church and state authority is inevitable in a complex modern society " *Id.* at 123, 103 S.Ct. at 509. Accordingly, the Court concludes that the Louisiana anti-noise statute does not unconstitutionally foster an excessive government entanglement with religion.

Because La.Rev.Stat. § 14:103.2 has a secular purpose, does not have the primary effect of advancing religion, and does not foster an excessive entanglement with religion, the Court holds that the statute does not violate the Establishment Clause of the First Amendment.

### B. Threat of Irreparable Injury

An injury is irreparable if it cannot be undone through monetary remedies. It is well established that "the loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury" justifying the grant of injunctive relief. *Deerfield Medical Ctr. v. City of Deerfield Beach,* 661 F.2d 328, 338 (5th Cir.1981) (*citing Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)) (additional citations omitted).

### C. Balance of Harms

The Court finds that the threatened injury to plaintiffs outweighs the harm to the State. Plaintiffs face the loss of First Amendment freedoms as well as arrest, prosecution and imprisonment if the statute is enforced. In contrast, the state has no interest in enforcing an unconstitutional statute.

### D. Public Interest

Finally, granting the preliminary injunction will not disserve the public interest. Protecting the citizens of Louisiana from potentially unconstitutional restrictions on their freedoms of speech, expression and association in public parks and on public streets best serves the public interest. Moreover, at least in New Orleans, there is currently in effect a comprehensive ordinance which protects Louisiana citizens and visitors from any harms associated with excessive noise in the city.

### III. CONCLUSION

For the foregoing reasons, the Court GRANTS plaintiffs' application for a preliminary and permanent injunctive relief. It is therefore ordered that M.J. "Mike" Foster, Governor of the State of Louisiana, and Richard Pennington, Superintendent of Police for the City of New Orleans, in their official capacities, and their officers, agents, assigns, officers, employees and successors, are hereby permanently ENJOINED from enforcing La.Rev.Stat. § 14:103.2.