UNITED STATES of America, Appellee,

v.

Jane DOE, a/k/a Diane Nomad, Appellant.

No. 91–3111.

United States Court of Appeals, District of Columbia Circuit.

Argued May 7, 1992.

Decided June 30, 1992.

Michael C. Wallace, Sr., Asst. Federal Public Defender, with whom A.J. Kramer, Federal Public Defender, was on the brief, for appellant.

Arthur B. Spitzer, with whom Elizabeth Symonds was on the brief, for amicus

curiae urging that the Court reverse appellant's conviction.

Mary-Patrice Brown, Asst. U.S. Atty., for appellee. Jay B. Stephens, U.S. Atty., John R. Fisher, Brian M. Murtagh, and Elizabeth H. Danello, Asst. U.S. Attys., were on the brief, for appellee.

Before WALD, EDWARDS and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

While beating a drum as part of a political protest in Lafayette Park across the street from the White House, Diane Nomad violated a federal regulation which prohibits playing a musical instrument at a higher than prescribed decibel level in a national park. In this appeal Nomad challenges the constitutionality of that regulation on the ground that it impermissibly restricts her First Amendment rights to engage in expressive conduct in a public forum. The district court ruled that the regulation survives First Amendment scrutiny as a "reasonable time, place, and manner" restriction on speech. We do not agree. The government has failed to carry its burden of showing that the regulation is "narrowly tailored" to further the government's interest in preventing excessive noise in a national park that is also an acknowledged public forum. The record before us is barren as to support for the government's position that the decibel limit imposed on musical instruments is a reasonable one; what evidence there is suggests the contrary, that given the amount of ambient noise generally present in Lafayette Park, the decibel level may be unreasonably low.

## I. BACKGROUND

As a protest against the United States' bombing of Iraq during the Gulf War, Diane Nomad, along with other protestors, chanted and beat drums in Lafayette Park for several days and evenings in January 1991. After a week of such protests, the United States Park Police warned the pro-testors that they were violating a federal regulation relating to national parks, which prohibits "operating ... an audio device, such as a ... musical instrument, in a manner that exceeds a noise level of 60 decibels measured on the A-weighted scale at 50 feet." 36 C.F.R. § 2.12(a)(1)(i) (1991). A police officer utilizing a sound meter with an A-weighted scale found the noise level in the park to exceed 70 decibels measured from two different locations, one 54 feet away and one 74 feet away from the chanting and drumming protestors. After three unheeded warnings, the police officers arrested Nomad and the other demonstrators for violation of the 60-decibel regulation.

Nomad moved in district court to dismiss the charge on the ground that the regulation itself violated the First Amendment. She argued that the regulation is overbroad because it prohibits a substantial amount of expressive conduct beyond the government's legitimate interest in preventing excessive or disturbing noise. The district court denied her motion, finding that the challenged regulation was a reasonable time, place and manner restriction, justified by the governmental interest of maintaining "a peaceful setting" in Lafayette Park. As "part of the group" of demonstrators beating the drums in violation of the § 2.12(a)(1)(i) decibel level, Nomad was subsequently convicted in a bench trial for "aid[ing] and abett[ing] this concerted action."

## II. DISCUSSION

■ There can be no question that beating a drum in the context of a clearly identified anti-war demonstration is expressive conduct protected by the First Amendment. *See, e.g., Ward v. Rock Against Racism,* 491 U.S. 781, 790, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989); *Texas v. Johnson,* 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989). We are additionally spared the need for any extended "forum analysis" in this case, as no one disputes that Lafayette Park is a "quintessential public forum," *see White House Vigil for ERA Committee v. Clark,* 746 F.2d 1518,

1526–27 (D.C.Cir.1984), and accordingly, "the government's ability to permissibly restrict expressive conduct [there] is very limited." *United States v. Grace*, 461 U.S. 171, 177, 103 S.Ct. 1702, 1706, 75 L.Ed.2d 736 (1983); *see Hague v. CIO*, 307 U.S. 496, 515–16, 59 S.Ct. 954, 963–64, 83 L.Ed. 1423 (1939).

Furthermore, the Supreme Court has provided us with a three-pronged test which a government restriction must meet to restrict First Amendment protected speech in a public forum; the first of which is not in dispute in this case and the third of which we need not reach. "Even in a public forum the government may impose reasonable restrictions on the time, place or manner of protected speech, provided the restrictions 'are justified without reference to the content of the regulated speech, that they are *narrowly tailored to serve a significant governmental interest*, and that they leave open alternative channels for communication of the information.'" *Ward*, 491 U.S. at 791, 109 S.Ct. at 2754 (quoting *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 3068, 82 L.Ed.2d 221 (1984) (emphasis supplied)). Section 2.12 of the national park regulation on its face is content neutral. It prohibits the playing of all musical instruments above the prescribed level for whatever purpose or cause, and no one claims here that the regulation has been applied inconsistently or that Nomad has been singled out for prosecution because of her message. *See Clark*, 468 U.S. at 288, 104 S.Ct. at 3068.

▮ The dispute here pivots on the second prong of the "time, place, and manner restrictions" test. Nomad and amicus, the American Civil Liberties Union of the National Capital Area, assert that the decibel-limit for musical sounds specified in the regulation is not narrowly tailored to serve an important governmental interest in preserving Lafayette Park for appropriate uses. Rather, they argue, it is a blunder-buss weapon which results in severely impairing speech rights in a situs where the government not only tolerates but explicitly permits demonstrations and protests be-

cause of its unique location across the street from the White House. Nomad asserts the absence of any "tailoring," let alone "narrow tailoring" of the sound volume limit to the unique nature of Lafayette Park.

The government counters on two fronts. First, it asserts that it has a substantial interest in maintaining "the peaceful setting" in the nation's public parks. Appellee's Brief at 11. According to the government, "people turn [to public parks] for refreshment from the commotion and turmoil of everyday life. Maintaining Lafayette Park as a place of quiet enjoyment, therefore is a legitimate goal [of government]." *Id.* Second, it contends that it is not within this court's province "to fine-tune" the regulation or substitute its judgment for that of the Park Service as to whether § 2.12 should be applied to Lafayette Park. *Id.* at 13 (quoting *White House Vigil v. Clark*, 746 F.2d at 1529). As long as the Park Service's judgment on its application is reasonable, it is irrelevant that the Park Service—or the court—might have drawn the line differently, to allow more expressive conduct.

▮ Whether the regulation meets the "narrowly tailored" requirement is of course a question of law, to be reviewed by an appellate court *de novo*. *See, e.g., White House Vigil v. Clark*, 746 F.2d at 1529. This court has characterized "the test of 'narrow tailoring' . . . as a balancing test, inquiring whether the restriction 'burdens more speech than is necessary to further the government's legitimate interests.'" *Henderson v. Lujan*, 964 F.2d 1179, 1184 (D.C.Cir.1992) (quoting *Ward*, 491 U.S. at 799, 109 S.Ct. at 2758).

▮ To apply the "narrow tailoring" test in this case, we first determine the extent of the government's asserted interest. We recently recognized that the government has a substantial interest in promoting "the tranquil, contemplative mood at the [Vietnam Veteran's] Memorial wall." *Id.* at 11. In a similar vein, the Supreme Court has held that an ordinance prohibiting picketing in front of a person's home does not violate the First Amendment because the govern-

ment has a significant interest in protecting the integrity of the home and a person's feelings of "well-being, tranquility, and privacy." *Frisby v. Schultz,* 487 U.S. 474, 477, 108 S.Ct. 2495, 2498, 101 L.Ed.2d 420 (1988). Courts in these cases have found significant governmental interests in maintaining a tranquil atmosphere stemming from the essential nature of the locations involved—the sidewalks in front of a person's home and a memorial honoring the nation's war dead. Nothing in these cases, however, remotely suggests the existence of any generalized government interest in maintaining the same level of quiet in all public spaces.[1] Indeed, the very concept of a situs being designated as a "public forum" for First Amendment purposes presupposes that the situs has "been used for purposes of assembly, communicating thoughts between citizens and discussing public questions." *Hague,* 307 U.S. at 515–16, 59 S.Ct. at 963–64. Much like Hyde Park in London, Lafayette Park in Washington, D.C. has become a primary assembly point for First Amendment activity aimed at influencing national policies. Facing Pennsylvania Avenue and located directly across the street from the White House, it is exposed to every form of urban commotion—passing traffic, bustling tourists, blaring radios, performing street musicians, visiting schoolchildren. By no reasonable measure does Lafayette Park display the characteristics of a setting in which the government may lay claim to a legitimate interest in maintaining tranquility. This is evidenced by the government's own policy of issuing rally and demonstration permits for use in the park.

That said, the government certainly may justifiably impose some sound volume restriction upon persons in all parks including Lafayette. The Supreme Court has upheld the government's interest in preventing "excessive" noise in public parks, even in an urban area, *see Ward,* 491 U.S. at 781, 109 S.Ct. at 2748 (upholding noise ordinance for Manhattan's Central Park). Otherwise, citizens may be confronted with all manner of "unwelcome noise," *see City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 806, 104 S.Ct. 2118, 2129, 80 L.Ed.2d 772 (1984)—from evangelical zealots screaming into microphones to over-amplified rock music—and entirely prevented from doing their own thing in the park. But "excessive" noise by definition means something above and beyond the ordinary noises associated with the appropriate and customary uses of the park. The crux of our case, then, is whether § 2.12 as presently written is "narrowly tailored" to serve the interest of preventing "excessive" noise in Lafayette Park.

Section 2.12 is part of a group of regulations promulgated to "provide guidance and controls for public use and recreation activities (*e.g.,* camping, fishing, hunting, winter activities, boating) in areas administered by the National Park Service." 48 Fed.Reg. 30252 (1983). The entire set of regulations deals with uses typical of wilderness areas, such as Yellowstone Park, *i.e.,* campfires (§ 2.13), wildlife protection (§ 2.2), food storage (§ 2.10), and the collection of plant and animal specimens (§ 2.5), not for urban enclaves such as Lafayette Park.[2] The particular regulation Nomad violated provides in full:

§ 2.12   Audio Disturbances

(a) The following are prohibited:

(1) Operating motorized equipment or machinery such as an electric generating plant, motor vehicle, motorized toy, or an audio device, such as a radio, television set, tape deck or musical in-

---

1. In support of its position, the government cites *Kovacs v. Cooper,* 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949), which involved a municipality's power to prohibit "loud and raucous" noise on public streets. The Court there found the government's interest to be in preventing loud noise that constituted a "public nuisance." Moreover, the Court in *Kovacs* distinguished the public streets, where it allowed the restriction, from "parks and other open spaces," where, the Court hinted, the city might not be able to validly impose the same noise ordinance. *Id.* at 86, 69 S.Ct. at 453.

2. There is a separate 11–page section of Federal Regulations dealing specifically with First Amendment activities in the National Parks of the Capital. *See* 36 C.F.R. § 7.96(g) (1990). Nomad was not charged with violation of any of these regulations.

strument, in a manner: (i) That exceeds a noise level of 60 decibels measured on the A-weighted scale at 50 feet; or, if below that level, nevertheless; (ii) makes noise which is unreasonable, considering the nature and purpose of the actor's conduct, location, time of day or night, purpose for which the area was established, impact on park users, and other factors that would govern the conduct of a reasonably prudent person under the circumstances.

■ The government contends, nonetheless, that § 2.12's placement in a group of regulations designed for more typical national park usages is not cause for inference that the decibel level, *i.e.,* 60 decibels, was necessarily chosen with non-public forum areas in mind—those settings where even a modest noise from a radio or musical instrument might disturb the wildlife or detract from other visitors' ability to enjoy the soothing sounds of silence. Unfortunately, however, there is zero in the record to support the government's choice of the 60–decibel limit; no evidence indicating how disturbing or "excessive" a noise (by any standard) 60 decibels at 50 feet is. The government feebly suggests that because the Park Service is better suited than we to decide noise limits, its choice of this particular limit must be a reasonable one. But this is not a *Chevron* situation where administrative discretion is at its zenith. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984) (if congressional intent is silent or ambiguous in statute which agency administers, court must defer to permissible agency interpretation). Where constitutionally protected activity is implicated, we cannot simply defer to the Park Service's unexplained judgment. *See Henderson v. Lujan,* No. 91–5258, slip op. at 10 (noting that court "cannot defer to [Park Service's] judgment on the constitutional question" of "narrow tailoring").

■ In a First Amendment challenge, the government bears the burden of showing that its restriction of speech is justified under the traditional "narrowly tailored" test. That test, moreover, must be applied in a realistic manner which takes into account the nature and traditional uses of the particular park involved. Lafayette Park is not Okefenokee National Wildlife Refuge, even if both are under the Park Service's supervision. On the record before us, it is impossible not to conclude that "the means chosen [are] substantially broader than necessary to achieve the government's interest." *Ward,* 491 U.S. at 800, 109 S.Ct. at 2759. While the government offered no evidence of its own to show that anything above a 60–decibel sound volume would irritate or injure passersby or nonprotesting users of the Park,[3] evidence put in the record by defense counsel suggested that loud conversation—the speaking voice of a single person during questioning in the courtroom—exceeds 60 decibels. Trial Transcript ("Tr.") at 22. There was also evidence that electric generators in the Park operating at the time of the protest, when tested two days after Nomad's arrest, made noise that registered higher than 60 decibels at 50 feet. Tr. at 81–82. Further, Nomad presented evidence that the manufacturer's own instruction manual for the measuring meters used by the Park Police describes a 60–decibel sound as equivalent to "background music." Tr. at 25. While by no means conclusive, these particles of evidence certainly

---

**3.** Government counsel conceded for the sake of argument that passing traffic on the streets surrounding Lafayette Park often made noise that exceeded the regulation's limit. Counsel argued that an occasional burst of noise from traffic is less bothersome than a persistent noise, and therefore, the government may appropriately ban conduct in Lafayette Park that would actually make less noise than surrounding traffic. The logic of her argument is irrefutable, but it reveals nothing about the impact sound measur-

ing 60 decibels at 50 feet has on Park visitors or passersby. For all we know, the regulation might ban any noise that could be heard above passing traffic, which of course would frustrate the main purpose of a demonstration, to attract the attention of passersby. We certainly are in no position to assume that there is no feasible mid-ground where travellers on the street would be made aware of a demonstration but not subjected to unreasonable noise assault.

raise doubts as to whether the 60–decibel regulation prohibits only speech activity that is excessive or disturbing. In any event, it is the government's case to prove and it has failed to do so. There is nothing upon which we can base a holding that this regulation is "narrowly tailored" to promote the government's interest in maintaining an appropriate level of sound volume in a traditional public forum park during a permitted demonstration.

### III. CONCLUSION

Any regulation imposing noise limits on expressive conduct in a public forum must be "narrowly tailored" to the government's interest in preventing excessive noise. What is excessive must take into account the nature and purposes of the setting, along with its ambient characteristics. We decide here only that no case has been proffered that § 2.12 represents a reasonable restriction on expressive conduct in a park like Lafayette Park that is a recognized "public forum" for speech and assembly; its legitimacy in Yellowstone Park or other wilderness parks, for which the regulation was apparently primarily intended, is not affected by our ruling.

In light of our disposition of Nomad's First Amendment challenge to the regulation, we do not reach her argument that there was insufficient evidence to convict her, or that the district court erred in denying her motion for acquittal.

For the foregoing reasons, the judgment of the district court and Nomad's conviction is reversed. In light of government counsel's steadfast insistence at oral argument that the constitutionality of the regulation was a question of law which could not be supplemented by additional factfinding at the trial court level, we order that the charges against Nomad be dismissed.

*It is so ordered.*