Ron **ROHMAN**, Plaintiff,

v.

**CITY OF PORTLAND**, a municipal corporation, Charles Hales, and Pioneer Courthouse Square, Inc., an Oregon nonprofit corporation, Defendants.

Civil No. 95–1096–HA.

United States District Court,
D. Oregon.

Nov. 22, 1995.

Herbert G. Grey, Kelly E. Ford, Beaverton, Oregon, Steven T. McFarland, Gregory S. Baylor, Center for Law and Religious Freedom, Annandale, Virginia, for Plaintiff.

Harry Auerbach, Office of City Attorney, Portland, Oregon, for Defendants.

## OPINION AND ORDER

HAGGERTY, District Judge:

Plaintiff, Ron Rohman, brings this action challenging the Pioneer Courthouse Square Free Speech Policy (the "Free Speech Policy") under both the United States and Oregon Constitutions. Specifically, plaintiff alleges that the Free Speech Policy abridges his constitutionally protected rights to free speech and free exercise of religion. Plaintiff further alleges that the Free Speech Policy, as enforced, unconstitutionally in-

fringes on his due process and equal protection rights. Plaintiff seeks declaratory and injunctive relief, as well as money damages.

The jurisdiction of this court has been properly invoked under 28 U.S.C. § 1331. The matters now before the court are plaintiff's motion for a preliminary injunction, and if preliminary injunctive relief should issue, his request for an order waiving the attendant security requirement. In his motion, plaintiff seeks to enjoin the enforcement of the Free Speech Policy during the pendency of the instant action. For the reasons provided below, plaintiff's motion for a preliminary injunction and his request for a waiver of security are both granted.

## BACKGROUND

Pioneer Courthouse Square (the "Square") is a public park situated in downtown Portland, Oregon. The Square, inclusive of its surrounding sidewalks, encompasses an entire square block. The Square is bordered by Yamhill street to the south, by Morrison street to the north, by Sixth Avenue to the east, and by Broadway to the west. The Square is primarily an open plaza, which is used by the public for a myriad of purposes.[1] The Square also contains several commercial establishments.[2] According to the drafters of the Free Speech Policy, the Square "is the City of Portland's premier public gathering spot," and has been described as "the City's living room." Pioneer Courthouse Square Free Speech Policy § 1.1.

The Square is owned by the City of Portland (the "City"), and operated on behalf of the City by Pioneer Courthouse Square of Portland, Inc. ("Pioneer Square, Inc."), an Oregon nonprofit corporation. In June 1994, the Board of Directors of Pioneer Square, Inc. adopted the Free Speech Policy. Shortly thereafter, in August 1994, the Portland City Council ratified the Free Speech Policy, thereby giving it operative effect.[3]

In essence, the Free Speech Policy provides that when in the Square,[4] a person must be within a designated "Public Speech Area" if intending to audibly communicate (either by spoken word or musically) with another person who is within the confines of the Square and is more than ten (10) feet away.[5] It follows that there is no restriction on an individual's ability to communicate audibly within the Square, provided that the individual has no intention of communicating with persons beyond a ten foot radius. The Free Speech Policy contains the following definitions:

§ 2.1 "Speaker" includes speakers, musicians, or any other person who intends to communicate audibly with users of the square.

§ 2.2 "Immediate Vicinity" means an area within ten (10) feet of the Speaker.

The Free Speech Policy's operative provisions state, in part:

§ 3.2 Speakers who do not intend to communicate with users beyond the Speaker's immediate vicinity may speak or perform at any location in the Square ...

§ 3.3 Speakers who intend to communicate with users of the Square beyond the Speaker's immediate vicinity must use the Public Speech Area and comply with the

---

1. The public's use of the Square includes activities such as eating lunch, engaging in conversation, collecting signatures for petitions, and playing hacky-sack.

2. These establishments include a coffee shop, a book store, a few food-cart vendors, and an office of Tri–County Metropolitan Transportation District of Oregon ("Tri–Met").

3. A policy relating to public speaking in the Square had been in place prior to the Free Speech Policy, but that policy was rendered defunct with the adoption and ratification of the Free Speech Policy.

4. For purposes of the Free Speech Policy, persons within the Square encompass those person who are on the Square's immediately surrounding sidewalks. See Preamble to the Pioneer Courthouse Square Free Speech Policy ("The free speech policy is in effect for the entire Square, from curb to curb.").

5. Nothing in the record conclusively establishes the precise size or location of the Public Speech Area. However, according to plaintiff, the area encompasses one hundred square feet, it is in a part of the Square where people do not normally congregate, and it is a good distance removed from the sidewalks surrounding the Square. Affidavit of Ron Rohman, at 13.

procedures ... for the Public Speech Area.

As indicated above, speakers or performers who are confined to the Public Speech Area must comply with certain procedures prescribed under the Free Speech Policy. Specifically, any such person may use the Public Speech Area, to the exclusion of other similarly situated persons, for a period of thirty (30) minutes.[6] Pioneer Courthouse Square Free Speech Policy § 3.4.2. After the Public Speech Area is used for two consecutive 30–minute periods, a mandatory 15–minute silent period follows. *Id.* Although there is no set restriction on the number of 30–minute periods any individual can use the Public Speech Area on a given day, people who have not yet spoken or performed on that day, and who wish to be heard, are given preference. *Id.* § 3.4.3. Notwithstanding the above, no person is allowed to use the Public Speech Area when the Square is under permit.[7] *Id.* § 3.6.

An individual's compliance with the procedures set forth under the Free Speech Policy does not exempt the individual from the City's noise disturbance ordinance; rather, any user of the Square remains subject to that ordinance, "which prohibits the creation of any noise that annoys or disturbs a reasonable person of normal sensitivity." *Id.* § 3.5. A person found to be in violation of either the Free Speech Policy or the City's

noise ordinance may be excluded from the Square for a period of time.[8]

Plaintiff is an ordained minister who has been involved in "open air preaching" since 1970. Affidavit of Ron Rohman, at 3. Plaintiff believes that he has been commanded by God to spread the Gospel or "Good News" of salvation through Christ to the world at large.[9] *Id.* In pursuit of that objective, plaintiff has been preaching in the Square on a regular basis since the Square's inception in 1984. *Id.* at 5–6.

Plaintiff admits that he preaches in a loud voice. Plaintiff contends, however, that the amount of ambient noise generally present in the Square forces him to preach loudly in order to preach effectively (that is, to have his message be heard). Plaintiff explains:

> At the Square, I preach my Christian beliefs publicly and out loud. It is necessary to use a fair amount of volume on the sidewalks and in the Square for passersby and Square users to hear well, due to the high noise level at the Square during the day. Sixth Avenue east of the Square is part of Tri Met's downtown bus mall, and the noisy diesel Tri Met ... buses pass within a short distance from my preaching location.... School and tour buses bringing visitors [to the Square] make similar amounts of noise, as do delivery trucks using the streets. Of course, the large numbers of pedestrians on the sidewalks

---

**6.** The Free Speech Policy states that "[t]he right to use the Public Speech Area will be allocated on a first come, first serve basis unless the Square determines that competition among Speakers requires a sign-up sheet, in which case the Square will administer a sign-up sheet." Pioneer Square Free Speech Policy § 3.4.4. The record before the court does not reveal whether a first come, first serve policy or a sign-up sheet is currently in effect.

**7.** The preamble to the Free Speech Policy provides that "[a]ny event on the Square requires a permit." The preamble goes on to define an event as "any activity involving a group of four or more persons who appear to be acting together and who are soliciting the public's attention."

Examples of "events" which have taken place on the Square are musical concerts and political rallies.

**8.** Section 3.5 of the Free Speech Policy states, in part, that "[a]ny person violating [the City's

noise] ordinance may be asked to reduce his or her volume, and may be subject to exclusion from the Square." Moreover, Portland City Code 20.12.265 provides that any person found to be violating any rule or regulation issued by the City Council, including the Free Speech Policy, may be excluded from any City park, including the Square, for a period of not more than thirty days.

**9.** More specifically, plaintiff describes the substance of his preaching in the following terms:

> The content of my preaching usually focuses on the salvation message (the Gospel) of the Lord Jesus Christ, which is that individuals are born sinful, that Christ came to earth to die for our sins, and that salvation (eternal life with God) is available to all those (and only those) who will accept the gift of salvation by trusting in Christ's finished work on the cross and receive the gift of salvation.

Affidavit of Ron Rohman, at 7–8.

and people using the Square also generate a lot of noise. Two waterfalls on the Square ... are extremely noisy, and can be heard at many locations throughout the Square.

*Id.* at 6–7. Despite the volume, plaintiff contends that his preaching style is nonconfrontational. *Id.* at 4. Instead, it is plaintiff's contention that he simply preaches loud enough for people in his vicinity to hear him, thereby affording people the opportunity to stop and engage in a more intimate conversation if they are interested in his message. *Id.*

Between August 1994 and May 1995, plaintiff has been issued four separate "exclusions" from the Square for violating the Free Speech Policy. The first two exclusions were dismissed on appeal for reasons not germane to the instant action. Pursuant to each of the two more recent exclusions, plaintiff was ordered to stay out of the Square for a period of thirty days.[10] With regard to these two later exclusions, plaintiff admits that he intentionally violated the Free Speech Policy because he believed the policy to be unconstitutional. *Id.* at 15–16.

Even during those times when plaintiff has not been banished from the Square, he claims that the Free Speech Policy has had a profound effect on his ability to communicate. Plaintiff expressly contends that:

The Free Speech Policy has directly harmed my ministry by preventing me from preaching to the hundreds and thousands of people who use the sidewalks on the square, and by precluding me from any preaching anywhere on the Square during its highest use times.... The location of the [Public Speech Area] ... has made it virtually impossible to use preaching as a method of attracting Square users to the Gospel.

*Id.* at 13–14.

## LEGAL STANDARD

■ To obtain preliminary injunctive relief in the Ninth Circuit, a party must meet one of two alternative tests. Under the "tradi-tional" test, preliminary relief may be granted if the court finds:

(1) the moving party will suffer irreparable injury if the preliminary relief is not granted;

(2) the moving party enjoys a likelihood of success on the merits;

(3) the balance of potential harm favors the moving party; and

(4) the advancement of the public interest favors granting injunctive relief.

*Burlington N. R.R. v. Department of Revenue,* 934 F.2d 1064, 1074 n. 6 (9th Cir.1991).

■ Under the alternative standard, the moving party may meet its burden by showing either (1) probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of hardships tips sharply in the moving party's favor. *Id.; Associated Gen. Contractors of Cal., Inc. v. Coalition for Economic Equity,* 950 F.2d 1401, 1410 (9th Cir. 1991), *cert. denied,* 503 U.S. 985, 112 S.Ct. 1670, 118 L.Ed.2d 390 (1992). These formulations "represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *United States v. Odessa Union Warehouse Co–Op,* 833 F.2d 172, 174 (9th Cir.1987). The Ninth Circuit earlier said that this really describes one test: "a continuum in which the required showing of harm varies inversely with the required showing of meritoriousness." *San Diego Comm. v. Governing Bd.,* 790 F.2d 1471, 1473 n. 3 (9th Cir.1986).

## DISCUSSION

Because I find that serious questions are raised regarding whether the Free Speech Policy offends the First Amendment to the United States Constitution, and that there exists a distinct possibility of plaintiff suffering irreparable injury, I need only address plaintiff's First Amendment claim in ruling on the instant motion.

---

**10.** The most recent exclusion received by plaintiff also excluded him from O'Bryant Square, which is located several blocks from the Square.

### 1. Injunctive Relief

#### A. The Merits

Plaintiff claims that the Free Speech Policy infringes upon his First Amendment right to free speech. The First Amendment provides, in part, that "Congress shall make no law ... abridging the freedom of speech." U.S. Const. amend. I. Under the due process clause of the Fourteenth Amendment, the same prohibition applies to the states. *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940).

■ Several matters relevant to the court's analysis of the Free Speech Policy under the First Amendment are either not in dispute or are beyond question, and therefore, necessitate little discussion. First, it is clear that plaintiff's preaching of the Gospel is expressive conduct protected by the First Amendment. *Capitol Square Review and Advisory Bd. v. Pinette,* — U.S. —, —, 115 S.Ct. 2440, 2446, 132 L.Ed.2d 650 (1995) (Scalia, J., writing for the Court); *Kreisner v. City of San Diego,* 988 F.2d 883, 898 (9th Cir.1993) (Kozinski, J., concurring) ("Religious speech is speech, entitled to exactly the same protection from government restriction as any other kind of speech—no more and no less."). Second, the parties, as well as the court, agree that the Square is a public forum, and thus, the City bears an extraordinarily heavy burden to regulate expressive conduct there. *N.A.A.C.P., Western Region v. City of Richmond,* 743 F.2d 1346, 1355 (9th Cir.1984); *accord United States v. Doe,* 968 F.2d 86, 87–88 (D.C.Cir. 1992) (government's ability to permissibly re-

strict expressive conduct in a public forum is very limited); *see also Gerritsen v. City of Los Angeles,* 994 F.2d 570, 576 (9th Cir.) ("public parks ... represent the quintessential public forum"), *cert. denied,* — U.S. —, 114 S.Ct. 306, 126 L.Ed.2d 253 (1993).[11] Lastly, there is no meaningful disagreement that the Free Speech Policy is not an attempt by the City to restrict the content of speech;[12] rather, the Free Speech Policy is simply a restriction on the time, place, and manner of expressive conduct within the Square.

The Supreme Court has articulated a three-prong test which a government regulation must meet to restrict constitutionally protected speech in a public forum:

> [E]ven in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions "are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information."

*Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989) (quoting *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984)); *accord Gerritsen,* 994 F.2d at 577. "The failure to satisfy any single prong of this test invalidates the [regulation]." *Grossman v. City of Portland,* 33 F.3d 1200, 1205 (9th Cir.1994).

---

**11.** The Ninth Circuit has recently discussed the sanctity of parks as places to exercise First Amendment rights and the importance of preserving parks as arenas for the open exchange of ideas:

> Parks, in particular, "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." This venerable tradition of the park as public forum has—as suggested by the attendant image of the speaker on a soapbox—a very practical side to it as well: parks provide a free forum for those who cannot afford newspaper advertisements, television infomercials, or billboards.

*Grossman v. City of Portland,* 33 F.3d 1200, 1204–05 (9th Cir.1994) (quoting *Hague v. CIO,* 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939)).

**12.** In deciding whether a government regulation is content neutral, the purpose of the regulation controls. "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989). As discussed *infra,* the principal justification for the Free Speech Policy is the City's desire to curtail excessive noise, which, in and of itself, is unrelated to content.

■ The gravamen of the First Amendment challenge here is whether the Free Speech Policy is sufficiently tailored to further any significant interests. In order to answer this question, the court must initially examine the scope of the City's legitimate interest. *Doe*, 968 F.2d at 88. Several interrelated governmental interests have been identified in the record, namely (1) preserving the attractiveness, intact condition, and overall tranquility of the Square; (2) regulating excessive noise; (3) maintaining the Square as a multiple use, not a dominant use, facility; and (4) avoiding having religious exercise so dominate the Square that the City would violate the First Amendment's prohibition against the establishment of religion. *See* Defendants' Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction, at 6–7.[13]

The City has stated a legitimate interest which, at least facially, bears a reasonable relationship to the Free Speech Policy. It is well established that "the government may act to protect even such traditional public forums as city streets and parks from excessive noise." *Ward*, 491 U.S. at 796, 109 S.Ct. at 2756. While certain of the other stated interests may be adequate to support a government regulation in other cases,[14] *see e.g. Clark*, 468 U.S. at 296, 104 S.Ct. at 3070 (recognizing the government's "substantial interest in maintaining the parks ... in an attractive and intact condition"), they simply are not sufficiently related to the Free Speech Policy to pass constitutional muster.[15] In fact, at oral argument, defense counsel conceded that the Free Speech Policy is essentially a noise abatement ordinance. The dispositive question here has, thus, been reduced to whether the Free Speech Policy is "narrowly tailored" to serve the interest of preventing excessive noise in the Square.

■ I am mindful that to be narrowly tailored, the Free Speech Policy "need not be

---

13. The Free Speech Policy contains the following vague, sweeping statement of policy:

 The policy of Pioneer Courthouse square is to regulate speech and other forms of expression at the minimum level necessary to respect the interests of other users and neighbors of the Square.

 Pioneer Courthouse Square Free Speech Policy § 3.1.

14. Any attempt by the City to justify the Free Speech Policy on the basis of preserving the tranquil atmosphere of the Square is misplaced. In *United States v. Doe*, 968 F.2d 86, the District of Columbia Circuit considered this justification in relation to Lafayette Park, which is located across the street from the White House. The *Doe* court found that the essential nature of the location involved is determinative, and in the case before it found that a regulation on expressive conduct in Lafayette Park could not tenably be supported by an interest in preserving tranquility. *Id.* at 89. The court explained:

 [Lafayette Park] is exposed to every form of urban commotion—passing traffic, bustling tourists, blaring radios, performing street musicians, visiting schoolchildren. By no reasonable measure does Lafayette Park display the characteristics of a setting in which the government may lay claim to a legitimate interest in maintaining tranquility. This is evidenced by the government's own policy of issuing rally and demonstration permits for use in the park. *Id.*

 By analogy, the Free Speech Policy is not susceptible to a justification of maintaining the tranquility of the Square.

15. I find the City's asserted interest in not violating the Establishment Clause to be particularly specious. As a preliminary matter, a restriction on "private religious speech [in] an otherwise open forum on the ground that some observer might wrongly suspect official sponsorship ... would constitute content discrimination," and thus, would be ripe for constitutional challenge. *American Jewish Congress v. City of Beverly Hills*, 65 F.3d 1539, 1551 (9th Cir.1995) (Hall, J., concurring in part and concurring in the judgement). Moreover, nothing in the record suggests that allowing plaintiff to be heard, at any decibel level, would lead the "reasonable observer" to infer that the City endorsed plaintiff's preaching, *see Id.* at 1545, much less that the Square had become "a tax-supported church for the establishment of plaintiff's own brand of religion." Defendants' Memorandum in Opposition, at 3.

 It is indeed ironic that the City would proffer a potential Establishment Clause violation as justification for the Free Speech Policy at a time when a sizable Christmas tree has been erected in the Square. The Ninth Circuit has stated:

 [W]hile a reasonable passerby would never infer city endorsement of a soapbox speaker in the park, he or she would be much more likely to infer such endorsement from a large, unattended ... object....

 *Id.* at 1545 n. 7 (citing *Capitol Square*, —— U.S. at ——, 115 S.Ct. at 2458 (Souter, J., concurring) for the proposition that "an unattended display (and any message it conveys) can naturally be viewed as belonging to the owner of the land on which it stands").

the least restrictive or least intrusive means" of curtailing excessive noise. *Ward,* 491 U.S. at 798, 109 S.Ct. at 2757. Rather, the requirement of narrow tailoring is satisfied provided that the Free Speech Policy promotes noise reduction without burdening substantially more speech than is necessary to further that interest. *Id.* at 799, 109 S.Ct. at 2758. Because this is a First Amendment challenge, the City bears the burden of showing that the Free Speech Policy is warranted under this standard. *Doe,* 968 F.2d at 90. In the instant case, I find that, at a minimum, there are serious questions concerning the City's ability to satisfy its burden.

The City has selected a means of combating excessive noise in the Square which appears to be substantially broader than necessary to achieve the desired result. First, as noted above, the City has in place a specific noise ordinance which is applicable to the Square, and which is in no way suspended or superseded by the Free Speech Policy. The City has not adequately explained why the Free Speech Policy is not, therefore, a superfluous limitation on constitutionally protected expressive conduct. Second, there is simply no empirical evidence in the record to support the City's choice of ten-feet as the limit intentional, communicative sound may travel before triggering the communicator's relegation to the Public Speech Area, with its attendant procedural constraints. The City fails to produce any evidence indicating the degree of disturbance created by or the excessiveness of a noise traveling ten feet. *See Doe,* 968 F.2d at 90. By contrast, plaintiff cites examples of arguably innocuous noises which travel distances in excess of ten feet, and which routinely occur in the Square. Finally, in analyzing whether the Free Speech Policy is sufficiently tailored to combat excessive noise, the court is obliged to take a pragmatic approach, considering the nature and traditional uses of the Square. *Id.* Doing so, it seems that given the Square's status as the City's "premier public gathering spot," as well as the high level of ambient noise generally found in the Square, the Free Speech Policy may set a noise limit which is unreasonably restrictive.

Because the presence of adequate alternative channels for communication will not save a restriction which is not narrowly tailored, *see Id.* at 88, I need not, at this juncture, consider whether the Free Speech Policy leaves open ample alternative channels of expression (the third prong of the test enunciated by the Court in *Ward*). *See Grossman,* 33 F.3d at 1205 n. 10.

Although not specifically raised by plaintiff, the court finds that the Free Speech Policy, as written, may be unconstitutionally vague and/or under-inclusive. In these regards, the potential shortcoming of the Free Speech Policy is that, by necessity, the policy defines offensive conduct as *intending* to communicate with another user of the Square who is over ten feet away. The policy may be under-inclusive in that a "speaker" would not be in violation for creating excessive noise intended to reach a user who was only ten feet, or less, away. While this particular problem may be alleviated to the extent that "intent" for purposes of the Free Speech Policy includes a speaker's substantial certainty that his voice will carry over ten feet (a matter not clear on the face of the policy), it begs two pertinent questions. First, how is a speaker to know, with any degree of certainty, whether his voice will reach beyond ten feet? Second, how is a law enforcement official to determine whether a speaker is intending to communicate? These queries lie at the heart of the court's vagueness concerns.

A government regulation is unconstitutionally vague if it "(1) does not define the conduct it prohibits with sufficient definitiveness and (2) does not establish minimal guidelines to govern law enforcement." *United States v. Davis,* 36 F.3d 1424, 1434 (9th Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 1147, 130 L.Ed.2d 1106 (1995). Here, a speaker of ordinary intelligence may not understand that his conduct is prohibited by the Free Speech Policy. Moreover, the Free Speech Policy may not afford law enforcement officials with the minimal guidance needed to effectively and even-handedly enforce it.

As noted above, because I find that serious questions are raised as to plaintiff's First

Amendment claim, I need not reach his claims arising under the Fourteenth Amendment nor his claims arising under the Oregon Constitution.

### B. *Irreparable Injury or Balance of Hardships*

 Plaintiff alleges that he has suffered severe and irreparable injury as a result of the Free Speech Policy, and that he will continue to suffer such consequences if the policy is not enjoined during the pendency of this action. More specifically, plaintiff alleges that the Free Speech Policy has undermined his ability to effectively preach his message. Plaintiff further alleges that his failure to reach people with the Gospel is in defiance of God's command, and thus, could have both temporal and eternal consequences.

I find that plaintiff suffers from a real possibility of irreparable harm should the Free Speech Policy remain in effect. In addition to the harms noted above, the continued operation of the Free Speech Policy may serve to prolong a deprivation of plaintiff's First Amendment freedoms. Such a deprivation, for any degree of time, constitutes irreparable injury. *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976).

In contrast to the genuine probability of irreparable injury faced by plaintiff, defendants face no serious hardships should the court enjoin the Free Speech Policy throughout the remainder of this action. The continued availability of the City's noise disturbance ordinance provides the City with a mechanism to regulate any overtly excessive noise in the Square.

In light of the above, I find that plaintiff is entitled to injunctive relief.

### 2. *Security*

Typically, when a court grants preliminary injunctive relief, the applicant is required to furnish security, "in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined...." Fed.R.Civ.P.

65(c). In the case at bar, however, defendants have consented to the waiver of the security requirement. Accordingly, the court waives this requirement.

## CONCLUSION AND ORDER OF THE COURT

For the reasons provided above, plaintiff's motion (doc. # 13–1) for a preliminary injunction is GRANTED, and plaintiff's request (doc. # 13–2) for a waiver of the security requirement is GRANTED.

IT IS ORDERED that the Pioneer Square Free Speech Policy is enjoined during the pendency of this action. IT IS FURTHER ORDERED that plaintiff shall not be required to post any security under Fed. R.Civ.P. 65(c).

IT IS SO ORDERED.