**Steve KLEIN, et al., Plaintiffs,**

**v.**

**CITY OF LAGUNA BEACH,
et al., Defendants.**

**Case No. SACV 08–01369–CJC(MLGx).**

United States District Court,
C.D. California,
Southern Division.

Jan. 23, 2009.

William G. Gillespie, Bonsall, CA, Michael J. Kumeta, Esq., La Mesa, CA, for plaintiffs.

Philip D. Kohn, Esq., Rutan & Tucker LLP, Costa Mesa, CA, for defendants.

## ORDER DENYING PLAINTIFFS' EX PARTE APPLICATION FOR A TEMPORARY RESTRAINING ORDER

CORMAC J. CARNEY, District Judge.

### I.  INTRODUCTION

Plaintiff Steve Klein and other activists (collectively "Mr. Klein") seek a temporary restraining order to enjoin the Defendant City of Laguna Beach (the "City") from enforcing its amplified sound ordinance restricting the use of sound-amplification equipment near schools, City Hall, and between the hours of five p.m. and nine a.m. Because the City's ordinance is a content neutral, reasonable restriction on the time, place and manner of speech, and because Mr. Klein has not shown that the balance of the hardships tips sharply in his favor, Mr. Klein's ex parte application for a temporary restraining order is DENIED.

### II.  BACKGROUND

In January of this year, Mr. Klein requested permission from the City to en-

gage in three activities: (1) to use an amplified bullhorn to "communicate the Gospel and a pro-life message" to students on the sidewalks adjacent to Laguna Beach High School immediately following the final bell of the school day; (2) to conduct similar expressive activities using a bullhorn from 4 p.m. to 5 p.m. on the sidewalk outside Laguna Beach City Hall; and (3) to travel from City Hall to the business district to distribute literature and spread his political and religious message through the use of a bullhorn on the sidewalks. (Pl.'s Brf., Ex. 4.) Mr. Klein's purpose for using the bullhorn, according to his counsel, is to increase the range of Mr. Klein's voice; to reach people across a larger distance. Mr. Klein's counsel also stated that, by using a bullhorn, Mr. Klein hoped his voice could be heard over other sounds, conversations, and noises in the City. In particular, Mr. Klein's counsel stated that Mr. Klein wished to use a bullhorn to attract the attention of high school students who might otherwise be engaged in conversation with each other.

The City's outside counsel responded to Mr. Klein's request, advising Mr. Klein that he was free to engage in his activities—including the use of sound-amplification equipment—without permission, subject to the applicable ordinances regarding the use of sound-amplification equipment. (Pl.'s Brf., Ex. 7.) Counsel for the City further advised Mr. Klein that the City's "regulations do not prevent [Mr. Klein] from assembling in public places, carrying/displaying signs, distributing literature, and/or speaking with passersby." *Id.* The relevant ordinance governing the use of amplified sound in Laguna Beach states:

> The use of sound-amplifying equipment and sound trucks in the city shall be subject to the following regulations:
>
> (1) The only sounds permitted are music and human speech or both;
>
> (2) Sound shall not be emitted within one hundred yards of hospitals, churches, schools, and city hall;
>
> (3) The volume of sound shall be controlled so that it will not be audible for a distance in excess of fifty feet from the sound-amplifying equipment or sound truck, and so that the volume is not unreasonably loud, raucous, jarring, disturbing or a nuisance to reasonable persons of normal sensitivities within the range of allowed audibility;
>
> (4) Speakers for sound amplification shall be directed, to the extent possible, toward open, unoccupied space;
>
> (5) The sound amplifying equipment or sound truck shall not be used between the hours of five p.m. and nine a.m.

Laguna Beach Muni. Code § 7.25.120. Mr. Klein now seeks a temporary restraining order enjoining the City from enforcing § 7.25.120(2) and § 7.25.120(5) on the grounds that those provisions of the ordinance violate his free speech rights under the California and United States Constitutions.

### III. ANALYSIS

A party seeking a temporary restraining order must show that serious questions on the merits are raised and the balance of hardships tips sharply in his favor. *Sammartano v. First Judicial Court, in and for County of Carson City,* 303 F.3d 959, 965 (2002). As an irreducible minimum, a party seeking injunctive relief must show questions serious enough to require litigation. *Department of Parks for State of California v. Bazaar Del Mundo Inc.,* 448 F.3d 1118, 1124 (9th Cir.2006) (citations omitted). A temporary restraining order is an extraordinary and drastic remedy and should not be granted unless the movant, by a clear showing, carries the burden of persuasion. *See Mazurek v.*

*Armstrong,* 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997).

Mr. Klein seeks to prohibit the City from enforcing its ordinance regulating the use of sound-amplification equipment. The United State Supreme Court has held that the government may constitutionally regulate the use of such equipment if the regulation is content-neutral, narrowly tailored to a serve a significant government interest, and leaves open ample alternative channels of communication.

In *Kovacs v. Cooper,* a plurality of the Supreme Court upheld a municipal ordinance that banned "loud and raucous" amplified noises. *Kovacs,* 336 U.S. 77, 89, 69 S.Ct. 448 (1949). While stating that a complete ban on amplification within a city would likely be unconstitutional, "[u]nrestrained use throughout a municipality of all sound-amplifying devices would be intolerable." *Id.* at 81, 69 S.Ct. 448. The Supreme Court noted that even in the business district of a 125,000–person city like Trenton, New Jersey in the late 1940s, a city has an interest in controlling amplified sound:

> Such distractions would be dangerous to traffic at all hours useful for the dissemination of information, and in the residential thoroughfares the quiet and tranquility so desirable for city dwellers would likewise be at the mercy of advocates of particular religious, social or political persuasions. We cannot believe that rights of free speech compel a municipality to allow such mechanical voice amplification on any of its streets.

*Id.* at 87, 69 S.Ct. 448. In *Kovacs,* the Supreme Court sought to strike a balance between speakers' ability to "win the at-tention" of the "minds of willing listeners" while protecting the general rights of the population to live their lives, associate with each other, and conduct their business in peace. *Id.* at 88, 69 S.Ct. 448. As technology evolves to give individuals ever-greater power to reach masses of people, courts have attempted to strike this balance time and time again.[1]

In *Grayned v. City of Rockford,* the Supreme Court found that it was appropriate for a municipality to protect schools from aural assault during the school day. 408 U.S. 104, 107–08, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). The ordinance at issue stated that "[n]o person, while on public or private grounds adjacent to any building in which a school or any class thereof is in session, shall willfully make or assist in the making of any noise or diversion which disturbs or tends to disturb the peace or good order of such school session or class thereof." *Id.* When considering whether a restriction on noise passes constitutional muster, the Supreme Court held that "the nature of a place," and "its pattern of normal activities" must be considered. *Id.* at 116, 92 S.Ct. 2294. The Supreme Court stated:

> Although a silent vigil may not unduly interfere with a public library, making a speech in the reading room almost certainly would. That same speech should be perfectly appropriate in a park. The crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time.

*Id.* The Supreme Court conceded "that the public sidewalk adjacent to school grounds may not be declared off limits for expres-

1. *In Red Lion Broadcasting Co. v. F.C.C.,* the Supreme Court discussed *Kovacs,* stating that "the ability of new technology to produce sounds more raucous than those of the human voice justifies restrictions on the sound level, and on the hours and places of use, of sound trucks so long as the restrictions are reasonable and applied without discrimination." *Red Lion,* 395 U.S. 367, 387, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969).

sive activity by members of the public. But in each case, expressive activity may be prohibited if it materially disrupts classwork or involves substantial disorder or invasion of the rights of others." *Id.* at 118, 92 S.Ct. 2294 (citations and quotation omitted). The Supreme Court recognized that peaceful picketing, passing out handbills, and other non-disruptive activities were perfectly appropriate on school boundaries. However, "schools could hardly tolerate boisterous demonstrators who drown out classroom conversation, make studying impossible, block entrances, or incite children to leave the schoolhouse." *Id.* at 119, 92 S.Ct. 2294.

The Supreme Court revisited the issue of amplified sound in *Ward v. Rock Against Racism,* upholding New York City guidelines that required users of a Central Park band shell to hire a city-approved sound technician to ensure that noise levels did not disturb Central Park users outside the concert areas. *Ward,* 491 U.S. 781, 803, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). In *Ward,* the Supreme Court found that the city could retain control of volume levels even though the band shell was a public forum. *Id.* at 791, 109 S.Ct. 2746. The government had "a substantial interest in protecting its citizens from unwanted noise." *Id.* at 796, 109 S.Ct. 2746. This interest is perhaps at its greatest when the government seeks to protect "the well being, tranquility, and privacy of the home, but it is by no means limited to that context, for the government may act to protect even such traditional public forums as city streets and parks from excessive noise." *Id.* (citations and quotations omitted). With this holding, the Supreme Court found it reasonable to regulate the use of sound-amplification equipment in Manhattan, arguably the most consistently cacophonous locale in the United States.[2] If the Supreme Court found it constitutional to regulate sound levels in "the city that never sleeps," it presumably would find it constitutional to regulate sound levels in smaller, more tranquil locales.

Even in the context of the abortion debate, one of the most contentious issues in contemporary discourse, the Supreme Court has upheld regulations on the use of sound-amplification equipment. *Madsen v. Women's Health Center Inc.,* 512 U.S. 753, 760, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994). In *Madsen,* a court issued an injunction specifically aimed at protestors in front of a clinic where physicians performed abortions. The relevant part of the injunction prohibited the protestors from "singing, chanting, whistling, shouting, yelling, use of bullhorns, auto horns, sound amplification-equipment or other sounds ... within earshot of the patients inside the Clinic." *Id.* at 760, 114 S.Ct. 2516. The injunction prohibited these activities during certain times of the day, or when surgery or recovery from surgery was occurring inside the clinic. *Id.* Applying a stricter standard than normal for time, place, or manner restrictions, the Supreme Court nonetheless found that the "First Amendment does not demand that patients at a medical facility undertake Herculean efforts to escape the cacophony of political protests." *Id.* at 772–73, 114 S.Ct. 2516.

Lower court rulings striking down laws regulating sound amplification have emphasized the lack of alternative channels available for reaching the speakers' desired audiences. For example, in *Wollam v. City of Palm Springs,* the California Supreme Court struck down a law banning

**2.** *See also Carew–Reid v. Metropolitan Transp. Authority,* 903 F.2d 914 (2d Cir.1990) (upholding New York's ban on sound amplifiers on subway platforms); *Housing Works, Inc. v. Kerik,* 283 F.3d 471 (2d Cir.2002) (upholding a ban on the use of amplified sound on the steps, sidewalk, and plaza in front of New York City Hall.)

the use of stationary sound-amplification equipment because few, if any, alternative methods existed for spreading the speakers' messages.

> In certain instances the sound truck may be the only practical means for communication of opinion; alternative modes of communication, such as radio or television, may be prohibitively expensive, not available, or not effective.... The loss of the loud speaker thus becomes a curtailment of the recognized right of the union to publicize effectively its cause at the job site.

*Wollam*, 59 Cal.2d 276, 284, 29 Cal.Rptr. 1, 379 P.2d 481 (Cal.1963). Similarly, in *Maldonado v. County of Monterey*, a district court struck down a county ordinance banning amplified human voices broadcast from public thoroughfares. *Maldonado*, 330 F.Supp. 1282, 1284 (N.D.Cal.1971). The plaintiffs in *Maldonado* were farm labor organizers who were trying to reach farmworkers in the fields because they could not reach them in labor camps or other remote areas. *Id.* at 1283. Furthermore, workers in fields were usually too far away from roads to be reached with a human voice. *Id.* at 1283 ("Using sound-amplification devices is the only really effective way of disseminating information....").

The foregoing cases make clear that a city can appropriately regulate amplified sound.[3] As long as the regulation is a reasonable, content-neutral one that is narrowly tailored to significant government interests, and the speaker has alternative channels available to convey his speech, the regulation will withstand constitutional scrutiny.

### A. No Serious Questions on the Merits

When considering the constitutionality of the City's ordinance, it is important to keep in mind Laguna Beach's unique nature. Unlike New York City or Trenton, Laguna Beach is a small, quiet city wedged between the Pacific Ocean and seaside bluffs. Its total area is no more than a few square miles. Art galleries, surf shops, and sidewalk cafes dot the narrow, sun-dappled streets of its business district. Locals, tourists, and teenagers stroll down the sidewalks in swimming suits and flip-flops, relaxing in the City's laid-back beach-town atmosphere. City Hall is at the eastern end of the business district. Up the hill is the high school, set on a small triangle of land in the middle of a residential neighborhood. Laguna Beach is no bustling metropolis. The closest thing Laguna Beach has to the din of the city is the sound of the Pacific lapping onto the sand, barely audible a half block away. To attract attention, to make one's self heard in such a place, all one likely needs to do is raise one's voice a little bit, or to say, "excuse me."

---

3. *See also U.S. v. Doe,* 968 F.2d 86 (D.C.Cir. 1992). In *Doe,* the District of Columbia Circuit determined that a National Park Service regulation limiting the level of noise in all national parks was not constitutional when enforced against a protester in Lafayette Park across the street from the White House, but might be constitutional in the natural setting of a more traditional national park. *Id.* at 91. While finding that an interest in tranquility offers justification for the regulation of amplified sound, the District of Columbia Circuit explained that "[b]y no reasonable measure does Lafayette Park display the characteristics of a setting in which the government may lay claim to a legitimate interest in maintaining tranquility." *Id.* at 89. However, the District of Columbia Circuit found that the government does have an interest in maintaining some order in parks, even urban parks across the street from the White House. "Otherwise, citizens may be confronted with all manner of unwelcome noise, from evangelical zealots screaming into microphones to over-amplified rock music—and entirely prevented from doing their own thing in the park." *Id.* (citations omitted).

Given the tranquil nature of Laguna Beach, it is understandable that the City wishes to regulate sound-amplification equipment.[4] Any amplified speech is likely to annoy many residents, students, teachers, City officials and workers, shop and restaurant workers, outdoor diners, and beachgoers—people conducting their daily affairs or enjoying the City's unique charms. In each of the three instances where Mr. Klein wishes to conduct his activities in violation of the City's ordinance, the City has shown a nexus between the law and the interests the City is trying to protect.

■ Laguna Beach High School is located on a triangle of land, embedded within a residential neighborhood on a hill overlooking the ocean. Even without the use of amplification, it would be nearly impossible for students leaving school to avoid Mr. Klein's expressive activities given the tranquil and compact nature of the school area. Entrance and egress points flow from narrow, hilly streets, limiting drivers' visibility. Mr. Klein has plainly stated that he wishes to use amplified noise at the moment the school dismisses its students. In the small area around Laguna Beach High School, the presence of teenage drivers, pedestrians, skateboarders, and parents picking up children creates an already hazardous traffic situation that would only be complicated by disruptive noise. Additionally, while classes might be dismissed, students and teachers are still inside the school building pursuing extracurricular activities and preparing for the next day's teaching and learning. The sidewalks at issue are only a few feet from the school; any amplified noise would likely permeate the campus and disrupt the activities inside its boundaries. Therefore, creating an amplified sound buffer around the school is sufficiently tailored to the City's important interests in maintaining a productive learning environment, tranquility, and, most importantly, safety.

■ Similar problems arise with Mr. Klein's use of a bullhorn at Laguna Beach City Hall. Mr. Klein wishes to broadcast his messages with a bullhorn from sidewalks that are only 15 yards away from City Hall. It is difficult to understand why Mr. Klein believes it is necessary to use a bullhorn to reach passersby who are only feet away from him. What is clear is that use of amplification equipment in front of City Hall would disturb the workers inside the building. The building is several decades old and is not built with modern soundproofing materials. The hearing room in City Hall is directly adjacent to the sidewalk. The City's concern for the protection of its own workplace is legitimate. See *Housing Works*, 283 F.3d at 479 ("The reason for the policy is clear: the noise level of amplified sound so close to the [New York] City Hall building is a distraction to the executive and legislative officials who work inside the building as well as to the members of the public who

4. Mr. Klein largely relies on *Reeves v. McConn*, a Fifth Circuit case striking down an ordinance in the City of Houston. *Reeves*, 631 F.2d 377, 388 (5th Cir.1980). Aside from being outside the Ninth Circuit, this case is easily distinguishable from the present situation given the fundamental differences in tranquility between Houston and Laguna Beach. Furthermore, the Fifth Circuit held in that case that "[t]hroughout this opinion we have affirmed the ability of the City of Houston to legislate in this area. We are certain that most citizens desire protection from unreasonable or disruptive levels of noise on the streets and from uninvited noise within the privacy of their homes. We say nothing today that prevents the city from granting that protection. When the city fears disruption, it may prohibit conduct that actually causes, or imminently threatens to cause, material and substantial disruption of the community or invasion of the rights of others." *Id.*

have business to transact there."). The City's ordinance is narrowly tailored to an interest in keeping its government functioning efficiently.

■ Finally, the blanket prohibition on sound amplification from five p.m. to nine a.m. is also sensible. Laguna Beach is an open-door, indoor/outdoor kind of town. Residences and businesses are interspersed throughout the City; residents and out-of-towners take advantage of the often mild weather as much as they are able. The City's ordinance protects residents during dinner hours and at their homes while allowing activists to use amplification equipment during the day as people go about their business. While a person might be able to ignore someone attempting to pass out a handbill or avert his or her eyes away from a sign, blocking out amplified speech presents an unwilling listener with a greater challenge. The City certainly has an interest in preserving the uniquely tranquil character of Laguna Beach for residents and others alike; its ordinance is likely narrowly tailored toward this purpose.[5]

Mr. Klein has ample alternative channels for publicly expressing his political and religious viewpoints. As the City pointed out to Mr. Klein, he is free to use signs and placards, and to pass out fliers expressing his speech. In the small, quiet City of Laguna Beach, it will be easy for Mr. Klein to spread his viewpoints. Additionally, many of the cases striking down ordinances that restrict sound-amplification equipment are artifacts of a bygone age that offered activists few media of mass communication. Twenty, thirty, or fifty years ago, a sound truck was an important means of spreading a message to a large group of people. Now, one must only have a computer and a printer to publish a newsletter or handbill. The Internet, e-mail, text messaging, and widespread mobile communications devices have made it easier than ever to reach a large audience on a small budget. Indeed, it might be easier for Mr. Klein to reach the youth he wishes to target by using Facebook or MySpace.

## B. Balance of Hardships

■ Mr. Klein has failed to show that the balance of hardships in this case tips in his favor. The balance of hardships, in fact, tips in the City's favor. Again, the City's ordinance does not prohibit Mr. Klein from engaging in his expressive activities. Mr. Klein is free to spread his ideas; the City has not, and is not attempting to silence Mr. Klein. He has numerous ways to make his views known that do not involve the use of sound-amplification equipment. He can display signs, hand out fliers, or speak to people on the sidewalk.

If the City, however, were to be enjoined from enforcing its ordinance, it would suffer hardship. At Laguna Beach High School, Mr. Klein's activities could create a safety hazard on the narrow, busy streets at a time when students are attempting to exit the school ground. Many drivers exiting the high school are inexperienced teenagers, likely to be easily distracted by ruckus around the school; and the stated purpose of Mr. Klein's use of a bullhorn is distracting people from their other activities. Excess noise around the school could also disrupt extracurricular activities, student studies, and teacher preparation for the next day. Noise out-

---

5. Mr. Klein also argues that the City has no justification for regulating amplified sound outside these buildings over the weekend. Mr. Klein, however, is not seeking to engage in speech activities over the weekend. Mr. Klein's stated purpose is to reach passersby as they conduct business at City Hall and students as they exit from the Laguna Beach High School, not to conduct his expressive activities outside empty buildings.

side City Hall could cause degradation or interruption of City services, or at the very least, could distract employees, reducing efficiency. This would cause a hardship to government and the residents who depend on the efficient provision of government services. Similarly, Mr. Klein could disrupt the pleasant atmosphere of the Laguna Beach business district, causing businesses to lose customers and creating an unpleasant experience for those who embrace the lovely weather and charming atmosphere of this corner of Southern California.

The possible hardships caused by enjoining the ordinances are not limited to Mr. Klein's activities. Striking the City's ordinance down would open the door to any group or individual who wanted to use amplified sound to spread its beliefs. Indeed, it is not difficult to imagine a free-speech arms race of sorts, where groups compete with each other to be heard; each one turning the volume up a notch to attract attention. Soon, the tranquil character of Laguna Beach could be lost; the sounds of the ocean drowned out in a sea of blaring bullhorns. This scenario would cause hardship to businesses and residents, possibly costing them business and peace of mind. The members of the public who live in and visit the City of Laguna Beach have an interest in maintaining their tranquility and safety. The Court cannot allow Mr. Klein to use the First Amendment as a weapon to hold people captive and make them listen to his political and religious viewpoints.

## IV. CONCLUSION

For the foregoing reasons, Mr. Klein's ex parte application for a temporary restraining order is DENIED.